STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-18-112

MAINE CITIZENS FOR CLEAN )
ELECTIONS, SUSAN MACKEY- )
ANDREWS, BEN CHIPMAN, CRYSTAL )
CANNEY, GEOFF GRATWICK, LINDA )
SANBORN, RICH EVANS, WALTER )
RISEMAN, TOM SAVIELLO, ERIC )
JOHNSON, ALISON SMITH, and )
JOLENE LOVEJOY, )
)
)                                                        **DECISION AND ORDER**
Plaintiffs, )
)
v. )
)
HONORABLE PAUL LEPAGE, )
as GOVERNOR OF MAINE, and )
HONORABLE ALEC PORTEOUS, )
as COMMISSIONER, MAINE )
DEPARTMENT OF ADMINISTRATIVE )
and FINANCIAL SERVICES, )
)
Defendants, )
)
and )
)
MAINE COMMISSION ON )
GOVERNMENTAL ETHICS AND )
ELECTION PRACTICES )
)
Party-in-Interest. )

By agreement of the parties, and pursuant to this Court's Procedural Order

dated July 2, 2018, this matter is before the Court on Plaintiffs' motion for

preliminary and permanent injunctive relief and on the merits of all of Plaintiffs' claims as pled in their First Amended Complaint.

## STATUTORY BACKGROUND

A. *Maine's Budget Statutes*

Maine operates on a biennial budget calendar, fiscal year July 1 to June 30, with the Legislature approving two years' worth of expenditures in the first year of the legislative session. The Legislature provides two types of funding to each agency and department of state government: "appropriations" from the unrestricted General Fund and "allocations" from restricted special revenue funds. Wayne Aff. ¶ 27; P.L. 2017 c.284, §§ A-26. Annually, each agency must provide a "work program," a budget, to the Bureau of the Budget within the Department of Administrative and Financial Services (DAFS) showing the agency's requested "allotments" of funds to be spent each quarter of the fiscal year. Wayne Aff. ¶ 28; 5 M.R.S. § 1667. Allotments act as spending limits for the quarter. Wayne Aff. ¶ 28; 5 M.R.S. § 1667. The total allotments requested in an annual work program must match the total allocation available in that year. 5 M.R.S. § 1667.

If an agency realizes that its allotments for a certain quarter will be insufficient, it may submit a revised work program to DAFS, subject to the Governor's approval. 5 M.R.S. § 1667. If the agency realizes its allotments in a special revenue fund will exceed current year allocations, the unused balance of

2

funds from the prior year may be carried forward subject to several conditions, including approval by the Governor by financial order. 5 M.R.S. § 1667-B(2).

## B. *Operation of the Maine Clean Elections Act*

The Maine Clean Elections Act, 21-A M.R.S. §§ 1121 *et seq.,* (MCEA) was established by citizen initiative on November 5, 1996. It provides state legislative and gubernatorial candidates with a means of funding their campaigns as an alternative to the traditional method of collecting and spending private campaign contributions. 21-A M.R.S. § 1123; Wayne Aff. ¶ 5. The MCEA is administered by the Commission on Governmental Ethics and Election Practices (Commission). 21-A M.R.S. §1124(1). Candidates seeking public funds through the MCEA must go through a certification process that includes signing a declaration of intent to participate and submitting the appropriate number of "qualifying contributions." 21-A M.R.S. § 1125(1), (3), (5). A "qualifying contribution" is a donation of $5 or more made to the Maine Clean Elections Fund ("the Fund") in support of a candidate. 21-A M.R.S. § 1122(7). The qualifying contributions are not donations to a candidate.

"The commission shall distribute to certified candidates revenues from the fund in amounts determined" pursuant to the MCEA.[1] 21-A M.R.S. § 1125(7). Such

---

[1] The amounts of both initial and supplemental payments are determined based on whether the candidate is running for state representative, state senator, or governor, whether the race is a

3

payments of "revenues from the fund must be distributed" within 3 days after certification. 21-A M.R.S. § 1125(7)(A), (B), (C). Payments made to candidates immediately after certification or after the results of the primary election are referred to as "initial payments." MCEA candidates may also receive additional payments which are referred to as "supplemental payments." A candidate may qualify for up to eight supplemental payments of a set amount by submitting the requisite number of additional qualifying contributions.[2] 21-A M.R.S. §§ 1125(8-B)(D)(2), (8-C)(D)(2), (8-D)(D)(2). The MCEA directs that supplemental payments "must be made within 3 business days of certification by the commission of the required number of additional qualifying contributions." 21-A M.R.S. § 1125(7-B).

C. *Funding the Maine Clean Elections Act*

The MCEA Fund is a "special, dedicated, nonlapsing fund" administered by the Commission that is

> established to finance the election campaigns of certified Maine Clean Election Act candidates running for Governor, State Senator and State Representative and to pay administrative and enforcement costs of the commission related to this Act.

5 M.R.S. § 1124(1). The Fund obtains its revenues through a variety of sources including $3 million transferred annually from the General Fund by the Legislature,

---

primary or general election, and whether such race is contested. *See* 21-A M.R.S. § 1125(8-B), (8-C), (8-D).

[2] See note 1, *supra*. The amount of the supplemental payments and the number of qualifying contributions required to obtain a supplemental payment are based on the office for which the candidate is campaigning. 21-A M.R.S. § 1125(8-B), (8-C), (8-D).

4

money designated by Maine taxpayers on their annual income tax returns, and $5 qualifying contributions collected by candidates pursuant to Section 1125.[3] 21-A M.R.S. § 1124(2).

On or before January 1st of each year, the Commission is required to report to the Legislature and the Governor "its projection of the revenues and expenditures of the Maine Clean Election Fund for the subsequent 4-year period." 21-A M.R.S. §1124(4). By law, the Commission must include in its projection "an operating margin of 20% to ensure sufficient funds in the event of higher-than-expected participation in the Maine Clean Election Act." *Id.* If the Commission's report shows that projected revenues for the subsequent 4-year period will exceed projected expenses plus the 20% operating margin, "the commission shall notify the Legislature and the Governor and request that the amount of expected funding that exceeds the expected demand. . . be transferred to the General Fund."*Id.* In making its projections the Commission receives assistance from DAFS and the Bureau of Revenue Services. On the other hand, if the Commission determines that projected revenue will be inadequate to meet the projected demand during the 4-year period, "the commission may submit legislation to request additional funding." *Id.*

---

[3] Because the Fund is nonlapsing, it also includes seed money contributions that remained unspent, revenues that were distributed but were unspent after a candidate lost a primary or general election, unspent distributed funds to a candidate who did not remain a candidate through the primary or general election, voluntary donations to the Fund and any fines collected pursuant to certain provisions of Title 21-A. *See* 21-A M.R.S. §1124(4)(D),(E),(F),(G) & (H).

Notwithstanding the foregoing annual reporting requirements regarding the Fund, the Commission has been advised by DAFS that it should follow the same general budget procedures as other agencies. Wayne Aff. ¶ 38. Due to the two-year (for legislative) and 4-year (for gubernatorial) nature of election cycles, there are frequently years when the Fund does not expend the full amount of revenues allocated to it. Wayne Aff. ¶ 38. DAFS has advised the Commission that when preparing its work programs setting out its allotments for the fiscal year, it should not include in its revenue estimates any unused monies remaining in the Fund from the prior year and still present in the Fund at the beginning of the new fiscal year. Wayne Aff. ¶ 40. Instead, DAFS has advised the Commission that if that unused balance is needed, the Commission should request a financial order to increase its allotment. Wayne Aff. ¶¶ 29, 40. The Commission has regularly made such requests of both Governor John Baldacci and Governor LePage, and in fiscal years 2009-2017 Governor LePage signed seven financial orders that carried forward the unused balance of the Fund. Wayne Aff. ¶¶ 35, 38. The Commission characterizes requests for financial orders to carry forward an unused balance of allocation from a prior fiscal year to the current year as "routine." Wayne Aff. ¶ 37.

The Commission has a small staff and pays DAFS $12,000 per year to manage its finances, budget and personnel matters. Wayne Aff. ¶ 36. When the Commission

6

needs a financial order, a DAFS staff financial analyst assigned to the Commission prepares the documents and forwards them for review. Wayne Aff. ¶ 36.

"If the commission determines that the revenues in the Fund are insufficient to meet distributions," the Commission may permit MCEA-certified candidates to solicit and spend private contributions, releasing them from the MCEA's prohibition on such activities. 21-A M.R.S. § 1125(13-A). As of July 6, 2018, the Fund had a cash balance of $4,666,072. Wayne Aff. ¶ 25.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs in this matter are Maine Citizens for Clean Elections, a non-profit organization that advocates for the MCEA program; five MCEA-certified candidates for the Maine Senate and two MCEA-certified candidates for the Maine House of Representatives ("the candidate-Plaintiffs"); and four citizens who made $5 qualifying contributions to the Fund in support of MCEA-certified candidates ("the citizen-Plaintiffs"). First Amend. Compl. ¶¶ 10-21. The candidate-Plaintiffs have all received their initial payments but have not received all the supplemental payments owed to them by June 30, 2018. First Amend. Compl. ¶¶ 11-17.

In September 2016, in accordance with their customary practice, the Commission's Director, Jonathan Wayne, and its Assistant Director, Paul Lavin, prepared a proposed budget for the fiscal biennium, FY 2017-2018 and FY 2018-2019. Wayne Aff. ¶¶ 39, 42. When preparing the revenue estimates, the Directors

7

did not include monies that they knew were either already left unused or would remain unused in the Fund at the end of FY 2016-2017. Wayne Aff. ¶¶ 40, 42.

During the latter part of 2017 and the early part of 2018, the Commission staff presumed that if the allocation to the Fund in the biennial budget was insufficient, the Governor would approve a financial order allowing an increase in allotments as necessary to make the payments to candidates as required by the MCEA. Wayne Aff. ¶ 44. As the Commission realized that it required more money than was in its allotments in order to make the required distributions to candidates, it submitted three financial orders in February, April, and May 2018. Wayne Aff. ¶¶ 46-48. The Commission viewed these as routine financial orders. Wayne Aff. ¶¶ 46-48. The Governor has declined to sign any of the submitted financial orders. Wayne Aff. ¶¶ 46-48. The financial order submitted in April 2018 would have increased the fourth quarter allotment by carrying forward $1,935,444 of the unused balance in the Fund at the end of FY 2017. Wayne Aff. ¶ 47.

The Commission had sufficient funding to make initial payments to candidates after the June 12, 2018 primary election results were known. Wayne Aff. ¶ 31. Without a financial order to increase its allotments, however, the Commission did not have sufficient funds at the end of June 2018 to make all the supplemental payments required to be distributed to MCEA candidates who had collected additional qualifying contributions. Wayne Aff. ¶ 32. The Commission determined

8

that 128 candidates had submitted additional qualifying contributions by June 30, 2018 for a total of $1,439,075 in supplemental payments required to be distributed. Wayne Aff. ¶ 33. Nevertheless, the Commission's available fourth quarter allotment only allowed it to distribute payments totaling $374,530, representing 26% of what these candidates were entitled to pursuant to the terms of the MCEA. Wayne Aff. ¶ 33. These candidates are still owed $1,064,545 in supplemental payments for which the Commission has already determined they are statutorily eligible. Wayne Aff. ¶ 33.

The Commission has not released the candidates from their obligation to refrain from receiving and spending private contributions under 21-A M.R.S. §1125(13-A) because, in the Commission's view, there are sufficient revenues in the Fund, namely, the unused monies from prior years the amount of which would be sufficient to make the supplemental payments owed.

On June 28, 2018, the Plaintiffs filed their complaint seeking declaratory and injunctive relief. Plaintiffs also moved for a temporary restraining order and requested a hearing within 10 days. On July 2, 2018, the Court held an unrecorded telephone conference with counsel for all of the parties, including counsel for the Commission. The parties agreed to a schedule for the filing of an amended complaint, the submission of briefs and a consolidated hearing/argument on the request for a preliminary injunction and on the merits. *See Procedural Order* dated

9

July 2, 2018. The parties, including the Commission as a party-in-interest, adhered to this schedule and submitted written arguments supported by affidavit testimony.

Count I of the Plaintiffs' First Amended Complaint seeks declaratory relief pursuant to Maine's Declaratory Judgments Act, 14 M.R.S. §§5951-5963. Count II seeks an injunction in the nature of mandamus and purports to be brought pursuant to M.R.Civ.P. 80B, 80C, 81(c) and the Maine Administrative Procedure Act (5 M.R.S. §§11001 et seq.). Count III asserts a claim under 42 U.S.C. §1983 alleging that the Plaintiffs are being deprived of their First Amendment rights. Count IV is also a claim under 42 U.S.C. §1983 and alleges that the Plaintiffs' contract rights under the MCEA have been (and continue to be) impaired in violation of Art. I, §10, cl.1 of the United States Constitution. Oral argument on the consolidated preliminary injunction request and the merits was held on July 24, 2018. *See* M. R. Civ. P. 65(b)(2).

## DISCUSSION

*Declaratory Judgment – Count I*

Maine's Declaratory Judgments Act empowers the court to determine the construction of a law when a person's "rights, status, and other legal relations" are affected by a statute and when doing so will "terminate the controversy or remove an uncertainty." 14 M.R.S. §§5954 and 5958. The MCEA mandates distributions of supplemental payments to candidates who provide additional qualifying

10

contributions. Since the Commission has not distributed to the candidate-Plaintiffs the full amount which they are owed and also will not allow them to raise and spend private funds, their rights are affected by the MCEA and they have standing to bring this declaratory judgment action.

Additionally, the Declaratory Judgments Act does not create a new cause of action -- one must already exist. *Berry v. Daigle*, 322 A.2d 320 (Me. 1974). To determine whether a private cause of action exists for Plaintiffs to bring their claim, the Court must look to the Legislature's intent, either express or implied. *Wawenock, LLC v. Dep't of Transportation*, 2018 ME 83, ¶ 5, ___ A.3d ___. In deciding whether the MCEA provides a private right of action, the Court uses statutory interpretation to divine the Legislature's intent. *Id.* at ¶ 7. "Citizen initiatives are reviewed according to the same rules of construction as statutes enacted by vote of the Legislature." *Opinion of the Justices,* 2017 ME 100, ¶ 59, 162 A.3d 188.

As the Law Court has recently reiterated, the mere presence of the words "shall" and "must" do not themselves indicate that a private cause of action exists. *Id.* at ¶ 9. This case, however, is unlike the Law Court's recent decision in *Wawenock*, where residents of the Town of Wiscasset did not have standing to enforce the Sensible Transportation Policy Act which provided for state highway policies. The STPA was broadly worded and applies to the whole state, articulating general policy directives. Here, the MCEA is applicable to a specific set of persons,

11

who have agreed to engage in the Clean Elections program, where the statute mandates certain actions by the Commission based on the actions of the candidates. The mandatory nature of those specific actions by the Commission indicates that the enactors of the law intended that there would be no discretion in the distribution of funds in accordance with the terms of the MCEA. To conclude that the candidate-Plaintiffs have no right of action to enforce the mandatory distribution of funds would essentially render the MCEA unenforceable, thereby defeating the fundamental purpose of the Act. The Court finds, therefore, that a private right of action exists under the MCEA for the candidate-Plaintiffs to enforce these mandatory distributions.[4] Accordingly, a declaratory judgment is appropriate and is not, as the Defendants argue, an advisory opinion.

When two statutes appear to conflict, the court should seek to harmonize them, if possible. *Estate of Footer*, 2000 ME 69, ¶ 11, 714 A.2d 129. When statutes cannot be harmonized, the more specific statute prevails over the more general. *Id.*; *Houlton Water Co. v. PUC*, 2016 ME 168, ¶ 21, 150 A.3d 1284.

The conflict present in this case is between 5 M.R.S. §§1667 and 1667-B, the general budget statutes, and 21-A M.R.S. §§1124 and 1125, the MCEA statutes. The two sets of statutes do not conflict on their face: if the Governor were to sign the

---

[4] The Court cannot find a basis to conclude that any of the Plaintiffs in this case, other than the candidate-Plaintiffs, have a right to enforce the distribution of funds under the MCEA.

Commission's requested financial orders to increase allotments in order to make required distributions, as all governors have done since the MCEA was enacted, the two sets of statutes would work in harmony. On the facts of this case, however, the two sets of statutes are in conflict. The Commission is required by the MCEA to make specific distributions, in specific amounts, at specific times, to specific persons, but the Commission is also required by the general budgetary statutes to obtain a financial order if its allotments are insufficient. If no financial order is issued, no distributions may be made because the State Controller, within DAFS, will not authorize such payments from the State Treasury. Wayne Aff. ¶ 28. The Commission thus finds itself unable to comply with its mandatory obligations under the MCEA because it is required to comply with the general budgetary statutes that interpose the need for a gubernatorial financial order.

The Court finds that the MCEA and the Fund are unique among Maine statutes. No party has cited to any other agency fund with mandatory distributions required in specific amounts, at specific times, to specific qualified persons from a special, dedicated and nonlapsing fund. Such specificity demonstrates the intent of the people to remove any discretion from the MCEA in connection with the mandatory distribution of funds to qualified candidates. The mandatory nature of the distribution of funds to qualified candidates also supports the conclusion that the enactors of the MCEA intended to remove the Legislature and the Governor from

13

the actual distribution of such funds. The unique and specific nature of the MCEA, supported by the "special, dedicated, nonlapsing" Fund, leads this Court to conclude that upon its failure to harmonize with the general budgetary statutes, the clear statutory distribution scheme embodied in the MCEA must control.

As an agency within the Executive Department of State Government, the Commission is generally required to comply with the budgetary statutes with respect to Commission operations, other than the statutorily mandated distribution of funds to qualified candidates. Even as to the distribution of such funds to qualified candidates, compliance with the general budgetary statutes is to be encouraged because it promotes efficiency and accountability. In the special circumstances of this case, however, where implementation of the general budgetary statutes (5 M.R.S. §§1667 and 1667-B) prevents the Commission from making the distribution of funds as mandated by law, those general budgetary statutes do not apply and no financial order under sections 1667 or 1667-B is necessary for the distribution of funds to qualified candidates as certified by the Commission under the MCEA.

The Defendants argue that the Plaintiffs' remedy is under section1125(13-A), rather than any action by this Court. The Commission has interpreted section1125(13-A) as inapplicable because there are, in fact, "sufficient revenues in the fund" and therefore it cannot release the candidate-Plaintiffs from their commitment to seek only public funding. The Commission's interpretation of

14

section1125(13-A) is a reasonable one. Indeed, it is consistent with the plain language of the statute. The Commission should not be required to contort the clear meaning of the statute for want of a financial order authorizing the distribution of funds to qualified candidates where: (1) there are more than sufficient revenues in the Fund and (2) the distribution of such funds is unambiguously required by the MCEA.

The Defendants have also argued that a decision by the Court requiring the Governor to sign a financial order would violate the principle of separation of powers as embodied in Maine's Constitution. *See* Me. Const., art. III. This Court, however, is not ordering the Governor to sign a financial order and questions that it has the authority to do so in any event. *See Kelly v. Curtis*, 287 A.2d 426 (Me. 1972). There is, therefore, no separation of powers issue. Rather, the Court finds and declares that the distribution of funds to qualified candidates in accordance with the strict statutory mandates of the MCEA does not require a financial order under the general budgetary statutes. The Court further finds that qualified candidates who have been certified by the Commission to be eligible for supplemental funding are legally entitled to the distribution of those funds. Accordingly, the Commissioner of DAFS is required to take whatever ministerial actions are necessary to make the funds available for distribution to qualified candidates upon certification by the Commission. Because a financial order is not required, the Court finds and hereby

15

orders that the Commissioner of DAFS make revenues in the Maine Clean Election Fund accessible to the Commission so that it can make its required distributions within three (3) business days of the date of this Decision and Order.[5]

*80B and 80C Claims – Count II*

Plaintiffs urge this Court to order Governor LePage to sign the April 2018 financial order which would carry forward the unused balance of the Fund from prior years. Although the ancient writs have been abolished in Maine, Plaintiffs argue that an action in the nature of mandamus is available against the Governor by means of Rule 80B. *See* M.R. Civ. P. 81(c). The Law Court has previously and specifically decided that the courts cannot order the governor to take action in the nature of mandamus. *Kelley v. Curtis*, 287 A.2d 426, 419 (Me. 1972). This Court, therefore, cannot provide the relief Plaintiffs seek in ordering the Governor to sign a financial

---

[5] The Court has chosen three days because 21-A M.R.S. §1125(7-B) requires the distribution of supplemental funds within three business days of certification by the Commission. Although the Court assumes that the Commissioner of DAFS will abide by this Court's declaration of the law in this case and will fulfill his obligations under the law as stated in this Decision and Order, the Court is also issuing an affirmative order in the nature of an injunction to the Commissioner of DAFS to make the funds for supplemental payments available for distribution to qualified candidates as certified by the Commission without the need of a financial order from the Governor. The Court's declaration has "the force and effect of a final judgment or decree." 14 M.R.S. §5953. Moreover, 14 M.R.S. §5960 authorizes the Court to grant supplemental relief based on the declaratory judgment "whenever necessary or proper." The candidate-Plaintiffs have asked for injunctive relief and the Court finds that such relief is necessary and proper in this case because the candidate-Plaintiffs are involved in campaigns for election and time is of the essence in the distribution of funds the MCEA requires to be made. Failure to make the distributions as required by law and by this Court's order could, over time, frustrate the very purpose of the MCEA.

order. In any event, the Court has already concluded that no financial order is needed in the circumstances of this case.

Plaintiffs next request an injunction in the nature of mandamus against the Commissioner of DAFS pursuant to M.R. Civ. P. 80C. Rule 80C is available for judicial review of final agency action. Plaintiffs have identified no reviewable final agency action by the Commissioner. Instead, they seek to review DAFS's failure to carry forward the unused balance from prior years as directed by the Commission without a financial order signed by the Governor.

The Maine Administrative Procedure Act (MAPA) provides that a person aggrieved by "final agency action" may seek judicial review in the Superior Court. 5 M.R.S. §11001(1). Similarly, an aggrieved person may seek judicial review from an agency's failure or refusal to act, and the Superior Court may order the agency to make a decision within a specified time. 5 M.R.S. §11001(2). M.R.Civ.P. 80C is the procedural rule that applies to actions under MAPA.

The term "final agency action" is defined to mean "a decision by an agency which affects the legal rights, duties or privileges of specific persons, which is dispositive of all issues, legal and factual, and for which no further recourse, appeal or review is provided within the agency." 5 M.R.S. §8002(4). An "agency" is "any body of State Government authorized by law to adopt rules, to issue licenses or to take final action in adjudicatory proceedings." 5 M.R.S. §8002(2). This case does

not involve the adoption of rules or the issuance of licenses. Nor does this case involve final action by an agency in an adjudicatory proceeding where "the legal rights, duties or privileges of specific persons are required by constitutional law or statute to be determined after an opportunity for hearing." 5 M.R.S. §8002(1).

The implementation of the budgetary laws generally applicable to the operation of State Government, in the context of this case, is not subject to judicial review pursuant to MAPA and M. R. Civ. P. 80C. This case is most appropriately analyzed as an actual case and controversy involving the statutory rights of specified persons seeking declaratory relief under the Maine Declaratory Judgments Act as discussed under Count I. The Court has granted relief to the candidate-Plaintiffs under Count I. The Plaintiffs, however, have not established that they are entitled to any relief under Count II of their complaint.

*First Amendment Violation, § 1983 Claim – Count III*

Plaintiffs contend that the delay in receiving their MCEA funds is a *per se* infringement on their First Amendment right to free speech in violation of 42 U.S.C. §1983. Section 1983 provides that:

> Every person who, under color of any statute . . . of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

18

42 U.S.C. § 1983. In *Buckley v. Valeo*, the United States Supreme Court found that a limitation on political campaign fundraising and expenditures is equivalent to a limitation on free speech, and therefore such limitations must be narrowly tailored. 424 U.S. 1, 14 and 58-59 (1976). The First Circuit has held that the MCEA is not an unconstitutional burden on free speech because it achieves a "rough proportionality between the advantages available to [MCEA] candidates . . . and the restrictions that such candidates must accept to receive these advantages." *Vote Choice v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993). *See also Daggett v. Commission on Governmental Ethics & Election Practices*, 205 F.3d 445, 467 (1st Cir. 2000). Plaintiffs argue that a delay in the receipt of their funding skews the rough proportionally so that the restrictions imposed by the MCEA are no longer narrowly tailored.

This Court cannot find, on this record, a *per se* violation of the First Amendment due to the approximately one-month delay in full funding. To find a *per se* violation of the Plaintiffs' First Amendment rights on the record in this case it would necessarily follow that a one-day delay in receiving MCEA funds would trigger a constitutional violation. Presumably, a similar constitutional violation would occur if the Commission could only make supplemental payments of 99% (rather than 26%) of what qualified candidates were owed under the MCEA. The affidavits from the candidate-Plaintiffs indicate their concerns that anything short of

19

full and timely MCEA funding will "severely impair," "severely hamper," and be "catastrophic" to their campaigns. There is no evidence before the Court, however, that the candidate-Plaintiffs have been unable to run their campaigns due to the delay in full funding. The Plaintiffs have failed to establish a *per se* violation of their First Amendments rights due to the delay in the full distribution of MCEA funds.

*Breach of Contract, § 1983 Claim – Count IV*

In Count IV of their First Amended Complaint, the Plaintiffs assert a claim under 42 U.S.C. §1983 that the Governor's failure to sign financial orders under 5 M.R.S. §§1667 and 1667-B amounts to an unconstitutional impairment of their contractual rights under the MCEA. The Court agrees that the candidate-Plaintiffs are legally entitled to the distribution of supplemental funds pursuant to and in accordance with the clear and specific terms of 21-A M.R.S. §§1124 and 1125. It does not necessarily follow that the failure to fully comply with the requirements of the MCEA regarding the distribution of funds to qualified candidates rises to the level of a constitutional violation.

Art. I, §10, cl. 1 of the United States Constitution provides in pertinent part: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." The prohibition in the "contract clause" is aimed at the legislative power of the State and its primary focus is on legislation that is designed to repudiate and adjust pre-

20

existing debtor-creditor relationships. *See Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470 (1987).

In this case, assuming a breach of contract, there has been no act of the Legislature that purports to impair any contractual obligations. The Plaintiffs have failed to establish a constitutional violation as alleged in Count IV of their Frist Amended Complaint.

## CONCLUSION

The entry is:

Judgment for the candidate-Plaintiffs on Count I of the First Amended Complaint. Judgment for the Defendants on Count I of the First Amended Complaint as to all other Plaintiffs. The Court declares the rights and duties of the parties as follows:

The distribution of funds to qualified candidates in accordance with the strict mandates of the Maine Clean Election Act (21-M.R.S. §§1124 & 1125) does not require a financial order from the Governor under the general budgetary statutes (5 M.R.S. §§1667 & 1667-B) and is not subject to any discretion on the part of any executive officer if there are sufficient revenues in the Maine Clean Elections Fund. Qualified candidates who have been certified by the Maine Commission on Governmental Ethics and Election Practices (Commission) to be eligible for supplemental funding are legally entitled to the distribution of those funds. The

Commission has determined that there is sufficient revenue in the Fund to make the required distributions. Defendant Alec Porteous, Commissioner of the Department of Administrative and Financial Services, is legally required to take whatever ministerial actions are necessary to make the funds available for distribution to qualified candidates upon certification by the Commission. Because no financial order is required, Defendant Porteous is hereby ORDERED to make revenues from the Maine Clean Elections Fund accessible to the Commission so that the required distributions can be made within three (3) business days of the date of this Decision and Order.

Judgment for the Defendants on Counts II, III and IV of the First Amended Complaint.

The clerk shall incorporate this judgment on the docket by notation reference pursuant to M.R. Civ. P. 79(a).

Date: August 2, 2018

William R. Stokes
Justice, Maine Superior Court

Entered on the Docket: 8/2/18

22