MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2016 ME 168
Docket:        PUC-14-470
Argued:        March 2, 2016
Decided:       November 17, 2016

Panel:         SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

HOULTON WATER COMPANY et al.

v.

PUBLIC UTILITIES COMMISSION et al.

HJELM, J.

[¶1]  We are called on for the second time to consider a decision of the Maine Public Utilities Commission approving a petition for reorganization filed by Bangor Hydro-Electric (BHE) and Maine Public Service Company (MPS), which were regulated utilities engaged in the transmission and distribution of electricity, and, during the pendency of this proceeding, merged to become Emera Maine.  Under the proposed reorganization, Emera Maine's parent company, Emera, Inc., would increase its ownership interest in Algonquin Power & Utilities Corporation (APUC), which is a publicly-traded company that is in the electricity generation business with generation facilities located in Maine.  Because of the relationship that would result

2

between Emera Maine, as a transmission and distribution entity, and APUC, a generator, the petition is subject to approval by the Commission.

[¶2] In the first appeal, we vacated the Commission's order approving the petition[1] because the Commission misconstrued the governing statute in the Electric Industry Restructuring Act, 35-A M.R.S. §§ 3201-3217 (2015). *See Houlton Water Co. v. Pub. Utils. Comm'n (Houlton I)*, 2014 ME 38, ¶¶ 35-38, 87 A.3d 749. On remand, the Commission again approved the petition. On this second appeal, filed by Houlton Water Company and the Industrial Energy Consumer Group (collectively, the intervenors), we conclude that the Commission acted outside of its authority when, in an effort to control the statutorily harmful effects of the transaction, it imposed conditions that would regulate APUC beyond what the Restructuring Act allows. We therefore vacate the Commission's order and remand with instructions to deny the petition.

## I. STATUTORY OVERVIEW AND BACKGROUND

[¶3] As we discussed in *Houlton I*, when the Legislature enacted the Restructuring Act, one of its objectives was to encourage "competition and

---

[1] Also at issue in the first appeal was a separate reorganization petition that would have allowed Emera to become involved in a wind power venture. *Houlton Water Co. v. Pub. Utils. Comm'n (Houlton I)*, 2014 ME 38, ¶ 1, 87 A.3d 749. As we discuss in this opinion, Emera has withdrawn from that venture, and it is no longer at issue.

innovation in the generation of electrical power." *Id.* ¶ 3; 35-A M.R.S. § 3204; *see also Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 2, 90 A.3d 451. To promote that goal, the Legislature separated the generation of electricity from the transmission and distribution of electricity (T&D); and "greatly reduced" the Commission's regulatory authority over producers and generators of electricity to the extent that the parties to this proceeding "refer to power generation as 'unregulated' in Maine"; but preserved the Commission's authority to highly regulate T&D entities. *Houlton I*, 2014 ME 38, ¶¶ 4-5, 87 A.3d 749.

> [T]he Act mandated that companies holding both generation and T&D assets divest themselves of the generation assets and generation-related activities . . . . Following divestiture, the Commission continues to regulate and oversee T&D utilities, which hold monopolistic rights to the limited T&D resources in Maine. Because the Restructuring Act allowed the investor-owned electric utilities to keep their transmission and distribution assets, the former electricity providers were transformed into transmission and distribution utilities fully regulated by the Commission.

*Id.* ¶ 4 (citation and quotation marks omitted). As an element of the Commission's extensive regulation of T&D utilities, proposed reorganizations of T&D utilities are subject to the Commission's approval. *Id.* ¶ 6; 35-A M.R.S. §§ 708(2), 3204(5) (2015).

4

[¶4]  In April 2011, BHE and MPS petitioned the Commission pursuant to 35-A M.R.S. § 708(2),[2] which applies to the reorganization of utilities, to authorize their parent company, Emera, to increase its ownership position in APUC to 25% from roughly 8%.[3]  As we described the proposed affiliate structure in *Houlton I*, "the proposed transactions would allow Maine's regulated T&D utilities—Bangor Hydro and MPS [now Emera Maine]—to be held in common ownership with companies engaged in electricity generation in Maine."  2014 ME 38, ¶ 9, 87 A.3d 749.  The parties agree that this would result in an "affiliated interest" between Emera Maine and APUC within the meaning of 35-A M.R.S. § 707(1)(A) (2015).  *See Houlton I*, 2014 ME 38, ¶¶ 9, 25, 87 A.3d 749.

[¶5]  Additionally, in a separate petition, Northeast Wind Holdings, LLC, which was owned by Emera, filed a reorganization petition that would

---

[2]  Title 35-A M.R.S. § 708 has been amended, *see* P.L. 2011, ch. 623, §§ A-13, A-14 (effective Aug. 30, 2012) (codified at 35-A M.R.S. § 708 (2015)), but the amended subsection is not the subsection under which BHE and MPS petitioned the Commission.

[3] The term reorganization encompasses

> any creation, organization, extension, consolidation, merger, transfer of ownership or control, liquidation, dissolution or termination, direct or indirect, in whole or in part, of an affiliated interest as defined in section 707 accomplished by the issue, sale, acquisition, lease, exchange, distribution or transfer of voting securities or property.

35-A M.R.S. § 708(1)(A).  Here, the APUC transaction would create an "affiliated interest" as defined in section 707, *see infra* ¶ 6 n.4, and is thus subject to the Commission's oversight under section 708.

authorize Emera to engage in a joint venture with a wind energy development company to create a new wind power generation company. The Commission consolidated the two petitions and held a hearing in late 2011 and early 2012.

[¶6]  After the hearing was completed, in April 2012 the Commission issued an order approving the two proposed transactions,[4] concluding, as to the APUC transaction, that Emera Maine had met its burden of showing that ratepayers would not suffer a net harm pursuant to section 708, which provides in part that the Commission may approve utility reorganizations, including the creation of affiliates, if the reorganization "is consistent with the interests of the utility's ratepayers and investors."  35-A M.R.S. § 708(2)(A).

[¶7]  In approving the petitions, the Commission interpreted section 3204(5)[5] as foreclosing a T&D utility from having a financial interest in a generation asset only if the T&D utility *controlled* the generator.  With respect to the APUC transaction, the Commission determined that pursuant to that test, the proposed transaction did not violate the Restructuring Act because

---

[4]  Because of changes in collateral transactions involving APUC while the matter was pending before the Commission, Emera's ownership share of APUC as approved by the Commission was reduced to 20% from the originally proposed 25%.  Because an affiliated interest is defined as one of at least 10%, *see* 35-A M.R.S. § 707(1)(A) (2015), the reduction in Emera's position in APUC did not affect the statutory analysis.

[5]  Section 3204(5) provides, "[e]xcept as otherwise permitted under this chapter, on or after March 1, 2000, an investor-owned transmission and distribution utility may not own, have a financial interest in or otherwise control generation or generation-related assets."  35-A M.R.S. § 3204(5) (2015).

6

Emera Maine, as the T&D entity, would not have an equity interest or voting position in APUC—in other words, because Emera Maine would not control APUC.

[¶8] The Commission also considered whether the transactions would compromise competition in the energy market. The Commission found,

> These affiliations raise significant concerns regarding the possible exercise of preferential treatment by a utility to its competitive affiliates. This preferential treatment could include allowing an affiliated generator . . . to gain access to non-public, strategically important information or through favorable treatment in terms of construction of or access to transmission facilities or services. The consequences could appear in two somewhat different respects: (1) harm to ratepayers of BHE and MPS in the form of higher T&D rates; and (2) harm to the [competitiveness] of the market (and competitors in the market) from preferential treatment of affiliates which lead ultimately to higher electricity supply prices for consumers.

Although the Commission found these risks of preferential treatment arising from the wind power venture to be "both real and significant," it also determined that those concerns were of "lesser importance" in the APUC transaction but that the financial risks generated by that reorganization would be eliminated if conditions were imposed.

[¶9] The Commission conditioned its approval of both petitions on compliance by the parties and other affected entities with more than fifty conditions. Some of those conditions relate exclusively to the APUC

transaction, others to the wind power transaction, and the remainder to both. The conditions address issues such as structural separation, financial risk, codes of conduct, and divestiture; and the conditions contain extensive requirements of external audits, service restrictions, and the maintenance of separate credit facilities, among other things.

[¶10]   Significant for purposes of this appeal, in approving the reorganization petition, the Commission imposed conditions on electricity generators, including APUC itself.  As the conditions apply to APUC, they include a requirement that APUC not permit Emera to participate in decision-making regarding APUC's generation of power in Maine; that, to the extent that the Commission determines that APUC's operations relate to BHE and MPS operations in Maine, APUC provide the Commission with access to its books and records, respond to discovery requests and participate in Commission proceedings without being allowed to object on the basis that the Commission does not have jurisdiction; and that the Commission have authority to order APUC to divest itself of certain power generation units.  The Commission also required, as a condition to approval of the petitions, that APUC submit a letter accepting the Commission's authority to enforce the order against it.

[¶11]   Houlton Water, the Office of the Public Advocate, and the Industrial Energy Consumer Group appealed the Commission's order as intervenors.   We concluded that the Commission's interpretation of section 3204(5) was erroneously narrow and held that even if a T&D entity would not ultimately obtain actual control of the electricity generator, that statute nonetheless prohibits the T&D from becoming affiliated with an electricity generator if the affiliation will become "likely to produce [in the T&D] incentives for favoritism that would undermine the purpose of the [Restructuring] Act."  *Houlton I*, 2014 ME 38, ¶¶ 35, 37, 87 A.3d 749.  We vacated the Commission's order and remanded the matter for the Commission to reconsider the petition under the clarified statutory standard.  *Id.* ¶¶ 2, 38.

[¶12]   On remand, choosing to proceed on the existing record, the Commission entered an order in October 2014 approving the petitions by a two-to-one vote.  As to the APUC transaction, the Commission concluded that "the reorganization[] result[s] in Emera Maine having a 'financial interest' in generation merely as a result of its affiliation with Northeast Wind Partners . . . and [APUC] through common ownership by the parent company, Emera."   The Commission determined, however, "that the [p]roposed [t]ransactions, *when subject to the substantial conditions imposed pursuant to*

*our 35-A M.R.S. § 708 authority* . . . do not violate the provisions of [section] 3204(5) as interpreted by the Law Court [in *Houlton I*]." (Emphasis added.) In other words, the Commission took the view that although Emera Maine would have a financial interest in generation that would be likely to create favoritism, that interest would be "adequately addressed through § 708 conditions," thus falling short of creating any unlawful incentives. The Commission imposed the same conditions contained in its April 2012 order in which it had originally approved the petitions. The intervenors again appealed.[6] *See* 35-A M.R.S. § 1320 (2015).

[¶13] While the appeal was pending, Emera Maine notified the Commission that Emera had agreed to sell its interest in the wind power venture to its partner in that proposed transaction. In January 2015, the Commission issued an order determining that its approval was not required for Emera to withdraw from the joint venture. Within several days after that order was issued, Emera formally withdrew from the venture. The Commission then moved that we stay this appeal so that the Commission could consider the effect of that development on the October 2014 consolidated order in which it had approved both the Northeast Wind and

---

[6] The Office of the Public Advocate, which previously appeared as an intervenor, has not participated in this appeal.

APUC transactions. We denied the motion and ordered that the appeal proceed in the normal course.

[¶14] Following the issuance of our order, the Commission allowed the parties an opportunity to be heard on the effect of the rescinded wind power transaction on the October 2014 order, part of which addressed Emera's now-withdrawn involvement in the wind energy project. Rejecting the intervenors' argument to the contrary, the Commission determined that the pendency of this appeal did not deprive the Commission of authority to proceed. The Commission then issued an order in August 2015, which addressed the effect of Emera's withdrawal from the wind power venture on the October 2014 order by eliminating thirteen of the conditions attached to the earlier order authorizing the reorganizations, and modifying eight others. The conditions applicable to APUC noted above, *see supra* ¶ 10, remained unchanged.

[¶15] The intervenors appealed from that order and moved to consolidate their appeals and permit supplemental briefing. We granted the motion, and the parties filed supplemental briefs to address the issues raised by the new appeal.

## II. DISCUSSION

[¶16]  We first consider whether the pendency of this appeal affected the Commission's authority to modify the October 2014 order as a result of Emera's decision not to proceed with the joint wind power venture.  After identifying the operative Commission decision, we address the intervenors' challenges to that decision.

A.    The Commission's Authority to Modify the October 2014 Decision

[¶17]    The intervenors argue that because the appeal of the Commission's October 2014 decision was pending when the Commission modified that decision in August 2015, the modification is void.

[¶18]  This issue reveals a conflict between two statutes governing the procedure for appeals from Commission decisions.   One of the statutes, 35-A M.R.S. § 1320(3) (2015), is framed in broad terms and provides generally that the rules of appellate process apply to appeals from Commission decisions: where rules regulating civil appeals from the Superior Court "use[] the term[] 'the court,' . . . they shall for purposes of an appeal from the commission mean 'the commission.'"  *See also* 35-A M.R.S. § 1320(1) (2015) ("An appeal from a final decision of the commission may be taken to the Law Court on questions of law in the same manner as an appeal taken

from a judgment of the Superior Court in a civil action."); M.R. App. P. 22 (effectively implementing section 1320).

[¶19] As one ostensible effect of section 1320, Maine Rule of Appellate Procedure 3(b) would apply here. That rule, subject to specific exceptions that are inapplicable in this case, prohibits a trial court—and therefore, pursuant to section 1320, the Commission—from taking any action affecting a case that is on appeal. Viewed in isolation, Rule 3(b) therefore would preclude the Commission from revising its October 2014 order while an appeal from that order was pending.

[¶20] In contrast, a different statute, 35-A M.R.S. § 1321 (2015), provides that "[t]he commission may *at any time* rescind, alter or amend any order it has made." (Emphasis added). As applied here, section 1321 affects a narrow aspect of appellate procedure by preserving the Commission's authority to alter or amend any order, at any time—even while an appeal is pending. In this way, section 1321 is inconsistent with the broadly framed provisions of section 1320 that subject appeals from Commission decisions to the constraints of Rule 3(b).

[¶21] As a familiar principle of statutory construction, specific statutes prevail over general ones when the two are inconsistent. *Fleet Nat'l Bank v.*

*Liberty*, 2004 ME 36, ¶ 10, 845 A.2d 1183; *see also* 2B Singer & Singer, *Sutherland Statutory Construction* § 51:2 at 215 (7th ed. 2012) ("If an irreconcilable conflict does exist between two statutes, the more specific statute controls over the more general one . . . ."). Applying this principle to resolve the conflict between sections 1320 and 1321, we conclude that the more general provisions of section 1320, which covers many aspects of appellate procedure in an undifferentiated way, yield to the more specific terms of section 1321. As a result, notwithstanding Rule 3(b), section 1321 preserved to the Commission the authority to issue the amended order in August 2015, even though that administrative action revised an order that was the subject of a pending appeal.

[¶22] We now consider the merits of intervenors' challenges to that order.

B. Commission Approval of APUC Transaction

[¶23] The central issue raised by the intervenors on this appeal focuses on the limitations of the Commission's authority to impose certain conditions as a predicate to its approval of the APUC transaction.

[¶24] Pursuant to section 3204(5), a T&D entity is prohibited from "own[ing], hav[ing] a financial interest in or otherwise control[ling]

generation or generation-related assets," subject to certain exceptions not applicable here. 35-A M.R.S. § 3204(5). In *Houlton I*, we addressed the nature of the "financial interest" that is barred when a reorganization results in a regulated affiliate interest: "if the relationship among the entities results in the T&D utility having a financial interest that would provide an incentive to favor certain generators over others, the proposed corporate restructuring is prohibited pursuant to section 3204(5)." 2014 ME 38, ¶ 36, 87 A.3d 749.

[¶25]  In this proceeding, the Commission determined that the proposed affiliation would give Emera—an owner of a company possessing T&D assets—a financial interest in APUC's electricity generation assets, which, without intervention, would be likely to create an incentive for Emera to favor APUC over other generators.  Seeking to eliminate this consequence of the proposed transaction, the Commission invoked its authority pursuant to section 708, which requires the Commission, when approving a reorganization of public utilities such as is proposed here, to "impose such terms, conditions or requirements as, in its judgment, are necessary to protect the interests of ratepayers."  35-A M.R.S. § 708(2)(A).

[¶26]  In its October 2014 order, the Commission determined that imposition of many specific conditions pursuant to section 708 would negate

an "incentive for favoritism . . . that would require [the Commission] to disallow those transactions under [s]ection 3204(5)." The intervenors contend that once the Commission made the initial finding that the reorganization would give Emera incentives of favoritism toward some generators, the Commission erred by resorting to section 708 and imposing conditions in an effort to ameliorate that resulting favoritism. The intervenors go on to argue that because the Commission may not use its authority under section 708 to transform a reorganization that violates section 3204(5) into one that satisfies the requirements of that statute, the Commission erred by approving the APUC transaction. Emera Maine and the Commission argue, on the other hand, that the Commission acted properly when it took those conditions into account *before* finally determining that Emera's financial interest would *not* likely create an incentive for favoritism toward APUC.

[¶27]    "We review decisions of the Commission with great deference[,] . . . disturb[ing] a decision only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution." *Taylor v. Pub. Utils. Comm'n*, 2016 ME 71, ¶ 5, 138 A.3d 1214 (citation and quotation marks omitted).

[¶28] The procedural history of this case demonstrates that the conditions set out in the most recent order, issued in August 2015, relate only to the proposed APUC transaction and are intended to satisfy the requirements of section 3204(5). The Commission first formulated conditions applicable to both the APUC and wind power transactions in its April 2012 order, where the Commission concluded that the transactions "raise significant concerns regarding the possible exercise of preferential treatment by a utility to its competitive affiliates"—precisely the type of "financial interest" that we later determined in *Houlton I* is prohibited by section 3204(5). The nature of the preferential treatment that concerned the Commission included the potential for sharing of "non-public, strategically important information," and "favorable treatment in terms of construction of or access to transmission facilities or services." On remand, the Commission framed its analysis based on the construction of section 3204(5) that we prescribed in *Houlton I* and made clear that the purpose of the conditions it formulated was still to prevent any "incentive for favoritism . . . that would require us to disallow those transactions under Section 3204(5)." Although in its August 2015 order the Commission modified the set of conditions it had

previously imposed to account for Emera's withdrawal from the wind power venture, the purpose of those conditions did not change.

[¶29] Given this history, we must view the entire body of the conditions contained in its most recent order to represent the Commission's view of what is necessary for the APUC transaction to meet, in the least restrictive way, the requirements of section 3204(5)—that a T&D entity may not have a financial interest in an electricity generator that is likely to produce incentives for favoritism—and not for some reason unrelated to the requirements of that statute.

[¶30] As discussed above, the Restructuring Act is "intended to effectuate the Legislature's goal of encouraging competition and innovation in the generation of electrical power." *Houlton I*, 2014 ME 38, ¶ 3, 87 A.3d 749. An essential ingredient to achieve that result is to largely deregulate electricity generation. Indeed, as we pointed out in *Houlton I*, the parties themselves

> refer to power generation as "unregulated" in Maine, although the generators are subject to some restrictions and must be licensed. *See generally* 35-A M.R.S. § 3202 (deregulating retail access to generation services); *id.* § 3203 (authorizing the Commission to license competitive electricity providers).

*Id.* ¶ 5.

18

[¶31]  Here, the conditions crafted by the Commission that are directed toward APUC constitute forms of agency oversight and control that are contrary to both the letter and purpose of the Restructuring Act.  That the Commission even saw the need to explicitly articulate particular controls over APUC as a condition to approving an increase in Emera's stock ownership of APUC is itself a demonstration that most or all of those conditions do not exist by operation of statute or otherwise.[7]

[¶32]  Beyond this, the Legislature has conferred general grants of authority to the Commission in several statutes.  In 35-A M.R.S. § 104 (2015), for example, the Commission is deemed to have "all implied and inherent powers . . . necessary and proper to execute faithfully its express powers and functions specified in this Title [35-A]."  Additionally pursuant to section 708, the Commission, when approving a reorganization, has the authority to "impose such terms, conditions or requirements as, in its judgment, are necessary to protect the interests of ratepayers."  35-A M.R.S. § 708(2)(A).

[¶33]  The extent of the Commission's authority as created by these statutes is circumscribed by the principle that the agency's action must not be

---

[7] One of the conditions that the Commission imposed on APUC would require APUC to allow the Commission access to its books and records.  In contrast to the other conditions addressed in the text, this form of agency intervention into matters of an affiliated generator appears to be statutorily authorized.  *See* 35-A M.R.S. § 708(2)(A)(1).

inconsistent with—in this case—the foundational legislative framework that gives electricity generators the freedom to operate with only minimal regulatory constraint. *See Houlton I*, 2014 ME 38, ¶ 5, 87 A.3d 749. Here, as an integral part of its approval of the APUC transaction, the Commission has attempted to materially expand the scope of its regulatory authority over an electricity generator beyond what the Restructuring Act will allow—for example, by requiring APUC to exclude Emera, which would own a significant ownership stake in APUC, from participating in certain decisions regarding power generation; by requiring APUC to authorize the Commission to direct that it divest itself of power generation facilities; and by requiring APUC to participate in Commission proceedings without the right to object on the ground that the Commission is without jurisdiction. The scope and depth of the Commission's regulatory weight affecting APUC as a generator is contravened by the Restructuring Act.[8] *Cf. Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034 (stating that statutes are to be construed to achieve legislative purpose).

---

[8] In its April 2012 and October 2014 orders, the Commission also imposed regulatory conditions on First Wind, which is the wind power producer that was associated with the joint venture from which Emera withdrew. The Commission abrogated the conditions specific to the wind power venture in its August 2015 order and, for the reasons discussed *supra* at ¶¶ 14-16, those conditions are no longer at issue.

[¶34]  In *Houlton I*, we did not hold that section 3204(5) prohibits a T&D entity from acquiring *any* financial interest in an electricity generator. Rather, we concluded that section 3204(5) bars the creation of a financial interest that would likely produce incentives for favoritism that would undermine the purpose of the Restructuring Act.  *Houlton I*, 2014 ME 38, ¶ 36, 87 A.3d 749.  To adjudicate the issue presented on this appeal, we need not decide whether as a general matter section 708 authorizes the Commission to impose conditions that would negate an otherwise proscribed financial interest when T&D and generation entities become affiliated.  Rather, we need hold only that the Commission acted outside of its authority when it imposed conditions on an electricity generator such as APUC, where those conditions contravene the legislative framework of allowing generators to operate with very little regulatory governance.  Because those conditions constitute a material portion of the underlying framework that the Commission viewed as necessary to approve the APUC transaction, we must vacate the Commission's decision and remand with instructions to deny the reorganization petition.

The entry is:

> Order of the Public Utilities Commission vacated.  Remanded to the Commission with instructions to deny the petition.

**On the briefs:**

Alan G. Stone, Esq., and Benjamin J. Smith, Esq., Skelton, Taintor & Abbott, Auburn, for appellant Houlton Water Company

Anthony Buxton, Esq., Andrew Landry, Esq., and Robert Borowski, Esq., Preti, Flaherty, Beliveau & Pachios, Augusta, for appellant Industrial Energy Consumer Group

William S. Harwood, Esq., and Rachel M. Wertheimer, Esq., Verrill Dana LLP, Portland, for appellee Emera Maine

Charles Cohen, Esq., and Leslie Raber, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

**At oral argument:**

Benjamin J. Smith, Esq., for appellant Houlton Water Company

Charles Cohen, Esq., for appellee Maine Public Utilities Commission

William S. Harwood, Esq., for appellee Emera Maine

Public Utilities Commission docket number 2011-170
FOR CLERK REFERENCE ONLY