STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & COUNSUMER DOCKET
DOCKET NO. AP-2018-03 ✔

HAROLD MACQUINN, INC., et al.,          )
                                        )
        Petitioners,                    )
                                        )
    v.                                  )
                                        )
TOWN OF MOUNT DESERT,                   )
                                        )        ORDER ON RULE 80B APPEAL
        Respondent,                     )
                                        )
_____          )
                                        )
GERALD SHENCAVITZ, et al.,              )
                                        )
        Intervenors,                    )
                                        )

Pending before the Court is Petitioners Harold MacQuinn, Inc. and Freshwater Stone and Brickwork, Inc.'s (collectively "MacQuinn") complaint for review of governmental action pursuant to M.R. Civ. P. 80B. The Court heard oral argument on the complaint on August 30, 2018. Participating in the oral argument were Jonathan Hunter, Esq. for MacQuinn, James Collier, Esq., for the Town of Mount Desert (the "Town"), and Daniel Pileggi, Esq., for the Intervenors.

**INTRODUCTION**

This case requires the Court to reconcile the seemingly inconsistent provisions of two municipal ordinances. In June 2014, MacQuinn filed an application pursuant to the Town's Quarrying License Ordinance ("QLO") to license quarrying activities on property owned by MacQuinn in the Town (the "Property"). Three years later, relying on the non-conforming use and grandfathering provisions of the Town's Land Use Zoning Ordinance ("LUZO"), the Planning Board denied MacQuinn's application for lack of "standing." As set forth herein, the Court concludes the Planning Board erred as a matter of law by interpreting the non-conforming use and

1

grandfathering provisions of the LUZO to impose a standing requirement, which the Planning Board determined MacQuinn failed to meet, rather than reviewing MacQuinn's quarrying application pursuant to the plain language of the QLO.

## BACKGROUND

The Property is shown on Mount Desert Tax Map 7 as Lot 75. The Property is located off Crane Road in an area of the Town on the west side of Somes Sound known as "Hall Quarry." Historically, quarries in that part of the Town are famous for their pink granite, and for supplying the granite used in major national construction projects such as the Congressional Library in Washington, DC, and the United States Mint in Philadelphia. Granite has been extracted from the Property at various times since the late nineteenth century.

In 1978, the Town adopted its first Land Use Zoning Ordinance. The 1978 LUZO did not reference mineral extraction or quarrying. MacQuinn acquired the Property in 1983. In November 2009, the Town amended the LUZO, adding the term "mineral extraction." Mt. Desert, Me., Land Use Zoning Ordinance § 8 (hereafter "LUZO § __."). At the same time, the Town re-zoned the district in which the Property is located to the Residential Two ("R2) district. LUZO § 3.1 (Nov. 16, 2009). Mineral extraction was a permitted use in R2 without a permit. LUZO § 3.4 (Nov. 16, 2009). The Town amended the LUZO again in May 2010. Mineral extraction remained a permitted use in R2 without a permit after the 2010 amendment. LUZO § 3.4 (May 4, 2010).[1] On July 23, 2012, the Town Planning Board held a public hearing to determine whether the quarrying

---

[1] The parties spar over whether in May 2011 the Town added a permit requirement to the LUZO that was in some way applicable to MacQuinn's quarrying operation. The parties also argue over whether the LUZO required MacQuinn to have an approved reclamation plan. Not surprisingly, the record is unclear on both points, since as the Town ultimately recognized, there was "significant ambiguity" surrounding the LUZO's application to quarrying. The Court, however, need not resolve the questions, since their resolution is immaterial, and hence unnecessary, to the Court's determination in this matter.

2

operations at the Property were "mineral extraction." The Planning Board determined by a 3-0 vote that "quarrying" is included under the definition of "mineral extraction."

On November 26, 2012, the Town enacted a moratorium on mineral extraction. According to the Moratorium Ordinance, the Town was experiencing increased development pressure from mineral extraction, specifically including the quarrying of granite in the area known as Hall Quarry. The Town noted that some areas of the Town might be affected by the development pressure, because of the "arguable nonexistence of any enforceable regulations or restriction" on mineral extraction, including quarrying, or "at least the grossly inadequate nature of the existing regulations." The Town further noted that "there is significant ambiguity in the current LUZO regulations concerning mineral extraction." The Town noted strong support for the Moratorium Ordinance. The Town stated it would need at least six months to develop the necessary amendments to the LUZO or to develop other ordinances to "accommodate these development pressures." The Town thus called a halt to any new mineral extraction, specifically including the quarrying of granite, that was not currently approved by the Town in one form or another.

After enacting the Moratorium Ordinance, the Town embarked on a robust, public process that led to the development of the QLO. On June 10, 2013 and again on June 28, 2013, the Town's Planning Board convened a public hearing on the "Proposed Quarrying Licensing Ordinances And Related Amendments to the Land Use Zoning Ordinance." At the Public Hearing, the Planning Board heard comments from Paul MacQuinn, the abutters, neighbors, business people, and other residents. Many of the comments specifically addressed MacQuinn's quarry on the Property, and the Planning Board chairman had to remind the public that the discussion was not meant to be focused on just one particular quarry. One member of the public stated he "felt that mining and quarrying were in Mount Desert's past and the future is tourism and environmental activities."

3

Other members of the public disagreed. The comments addressed multiple aspects of the proposed QLO and LUZO amendments.

On July 25, 2013, after eight months of effort, deliberation, and drafting, the Town struck what it considered to be the appropriate balance, and enacted the QLO.[2] The stated purpose of the QLO was and remains "to put into law minimum removal and reclamation standards and municipal procedures to regulate the quarrying of rock or stone while at the same time respecting the rights of pre-existing operations." Mt. Desert, Me., Quarrying License Ordinance § 1.4 (hereafter "QLO § __."). At the same time the Town amended the LUZO's Performance Standards to provide that "Quarrying activities are regulated by the Town of Mount Desert Quarrying License Ordinance." LUZO § 6B.12.

On or about June 12, 2014, MacQuinn filed an application with the Planning Board for a quarrying license pursuant to the QLO. According to MacQuinn's application, the project consists of a "Two Phase rock quarry. Phase 1 contains existing active quarry." Accordingly, MacQuinn filed its quarrying license application under section 6.1 of the QLO as an existing quarry.

On July 22, 2014 and September 16, 2014, the Planning Board held meetings to review MacQuinn's quarrying license application. At the conclusion of the hearing on September 16, 2014, the Planning Board concluded "based on the evidence submitted, that [MacQuinn] was a lawful, non-conforming pre-existing use. Therefore, as a lawful non-conforming, pre-existing use they are eligible to apply under Section 6.1 of the quarrying ordinance as an existing quarrying activity." For the next two and a half years, MacQuinn participated in the Planning Board's substantive review of MacQuinn's license application, attending hearings and providing extensive argument, documentation and information.

---

[2] It is not clear from the record precisely when the QLO became effective. *See* QLO § 2.3. However, no party to this case has raised the QLO's effective date as an issue having any relevance, and so the Court need not address it.

4

On May 11, 2017, the Planning Board held a Special Planning Board Meeting to revisit what it viewed as the issue of standing,[3] *i.e.* "[t]o hear evidence, including public comment, on the issue of whether the use of [the Property] is 'grandfathered' (i.e., a lawfully pre-existing nonconforming use)." The Planning Board held further hearing on the matter on June 13, 2017. At the June 13, 2017 meeting the Planning Board voted to reconsider its September 16, 2014 decision. The Planning Board spent the remainder of the meeting discussing "whether the quarry was a lawfully pre-existing, non-conforming use; i.e. whether the quarry was Grandfathered." In its analysis, the Planning Board never mentioned, considered, or referred to the QLO.[4] Instead, the Planning Board voted to "define quarrying as the extraction and removal of stone within 18 months to meet the grandfathering standards prior to 2009 and after 1978, or twelve months after 2009." The Town's attorney then suggested "voting on the definition as presented, thereby denying the Application as presented, because the Applicant has not met the definition." After lengthy discussion, the Planning Board decided by a 4-2 vote that "based on the definition of what the use of quarrying as the Board has determined it to be and the time periods required to be a grandfathered use, based on the evidence submitted to the Board by [MacQuinn], [MacQuinn] has not met the standard and is therefore not a grandfathered use, thus [MacQuinn] is not an existing active quarry and has no standing to apply for a quarrying permit."

MacQuinn appealed from that decision to the Town's Zoning Board of Appeals ("ZBA"). Hearing no evidence and acting solely in an appellate capacity, the ZBA "concluded that in order for an applicant to show it is an active quarry activity and therefore have standing to apply under the QLO," it must first show the quarry activity lawfully existed under the LUZO. The ZBA thus

---

[3] The Planning Board characterizes the question it raised of who can apply for a quarrying license under section 6.1 of the QLO as a question of "standing," although the term is more commonly applied to who has a right to pursue party status in court. *See, e.g., Roop v. City of Belfast*, 2007 ME 32, ¶ 7, 915 A.2d 966.
[4] At oral argument, the Town readily acknowledged that the Board did not apply the QLO in its standing analysis.

5

found the Planning Board correctly determined MacQuinn "failed to show it was lawfully existing under the LUZO as a pre-existing non-conforming use, or 'grandfathered' as the Planning Board referred to it." On January 19, 2018, the ZBA issued a written decision affirming the Planning Board's decision. This appeal followed.

## STANDARD OF REVIEW

Where, as here, the ZBA acted only in an appellate capacity, this Court reviews the decision of the Planning Board directly, not the decision of the ZBA. *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773. The decision of the Planning Board is reviewed for error of law, abuse of discretion, or findings not supported by substantial evidence in the record. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024 (quotation omitted). The party seeking to overturn the decision bears the burden of persuasion. *Id.* The decision of the Planning Board is again reviewed directly upon further appeal. *Id.*

## ANALYSIS

The issue before the Court is whether the Planning Board erred as a matter of law by using the LUZO to conclude that MacQuinn lacked standing to apply for a Quarrying License under the QLO. MacQuinn argues that the non-conforming use and grandfathering requirements of the LUZO do not create a standing requirement, and the Planning Board failed to apply the plain language of QLO § 6.1 to review MacQuinn's quarrying application.[5] The Town counters that the Planning Board properly relied on the non-conforming use and grandfathering standards of the LUZO in determining that MacQuinn lacked standing to apply for a Quarrying License, because

---

[5] MacQuinn also argues, in effect, that the Planning Board's findings are not supported by substantial evidence in the record. Since the Court finds the Planning Board erred as a matter of law, it is unnecessary to address MacQuinn's arguments based on the insufficiency of the evidence.

6

section 2.8 of the QLO expressly requires the Planning Board to consider the requirements of the LUZO. The Intervenors echo the Town's position, and add arguments of their own.

The interpretation of a municipal ordinance is a question of law subject to de novo review. *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293. "Although the terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole," courts must first look first to the plain language of the provisions to be interpreted. *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 22, 868 A.2d 161 (quotations omitted). Thus, the Court turns to the key provisions of the QLO and LUZO.

<u>The Ordinances</u>

Section 2.4 of the QLO states: "This Ordinance applies to all quarrying activities as defined as Quarrying in Article 10[6] (Definitions) . . . . Except as provided in Article 3 of this Ordinance." The QLO does not actually define the phrase "quarrying activities," but the QLO does define "Quarry" and "Quarrying." According to section 11.4, "Quarry" is defined as: "A place where rock or large stone is separated from the bedrock. The term does not include gravel pits or borrow pits." Similarly, section 11.4 defines "Quarrying" as: "The act of separation of rock or large stone from the bedrock." Thus, the phrase "quarrying activities" can be reasonably construed to mean the activities associated with separating rock or large stone from bedrock in a quarry.[7]

With the exception described below, the QLO "applies to all quarrying activities," including quarrying activities that are "new or proposed," "recurring," "expansions," and "existing." QLO § 2.4. Section 2.4(1) defines "new or proposed" quarrying activities as "activity

---

[6] The reference to Article 10 is clearly a typographical error. Definitions are actually contained in Article 11 of the QLO.

[7] Quarrying activities are also referred to in the QLO as "activities or the activity, and sites on which they occur are referred to as the site, sites, or activity sites." QLO § 2.4.

7

occurring in areas where activities have not previously occurred." Section 2.4(2) defines "recurring" quarrying activities as "activities in areas where such activities had ceased (for more than 12 months) or were inactive and are now reoccurring." Section 2.4(3) indicates that "expansions" mean expansions of "activity plans previously permitted by the Planning Board." Section 2.4 does not explicitly define "existing quarrying activities," but since section 2.4 defines all other types of quarrying activities, the phrase "existing quarrying activities" can be reasonably construed to mean what remains: quarrying activities that are not new or proposed, recurring, or expansions.

Notwithstanding section 2.4, section 3.1 of the QLO (which is entitled "Exemptions") provides that some quarrying activities (regardless of whether they are new or proposed, recurring, expansions, or existing) are exempt from application of the QLO. Most notably, given the arguments in this case, the QLO does not apply to: "Removal of stone or rock from the quarry site if it has already been separated from the bedrock." Section 3.1 of the QLO provides that such exempt quarrying activities, "may still require a conditional use permit under provisions of the Land Use Zoning Ordinance . . . ."

With regard to quarrying activities that are not exempt, *i.e*, separating rock or large stone from bedrock in a quarry, the QLO creates an entirely new grant of municipal approval: the Quarrying License. "All parties proposing to continue a quarrying operation, expand an existing quarrying operation, or propose the creation of a new quarrying operation, must receive a Quarrying License as set forth in this Ordinance." QLO § 2.6. With Planning Board approval, a Quarrying License is transferable. QLO § 4.1(G). A Quarrying License must be renewed annually, QLO § 8.4, and is subject to review every five years. QLO § 8.5.

8

Article 5 of the QLO governs license applications for new or proposed, recurring, or expansion quarrying activities. Section 5.1 states that: "Prior to the establishment, reestablishment, or expansion of a quarrying activity, an applicant shall apply for a Quarrying License from the Town." Section 5.2 describes the performance standards that apply to new, expanded, or reoccurring quarrying activities.

Article 6 of the QLO governs license applications for existing quarrying activities. Section 6.1 states that: "The owner or operator of any active un-licensed quarry activity shall, within 180 days from the effective date of this ordinance, submit an application pursuant to this Ordinance."[8] The QLO does not define the phrase "active un-licensed," although the meaning of the phrase can be deduced from examining its constituent parts.[9] The word "active" must be understood within its context. Section 6.1 is entitled "Application for Existing Quarrying Activities." The last sentence of the first paragraph of section 6.1 states that "[t]he application for existing quarrying activities" shall consist of certain described elements. The word "active" is sandwiched between these two appearances of the word "existing" in the section heading and the ultimate sentence of the prefatory language to section 6.1. Further, sections 2.4, 2.5, and 6.2 all use the word "existing" to describe the type of quarrying activity that is licensed under section 6.1. Thus, the word "active" as used in section 6.1 must be construed as synonymous with "existing" for purposes of interpreting the phrase *"existing* quarrying activity."[10] *See In re Estate of Roach*, 595 A.2d 433,

---

[8] *See supra* p. 4 note 2.

[9] The Town argues that it is necessary to look to the LUZO to interpret undefined terms in QLO § 6.1, specifically "existing" and "active unlicensed." (Def.'s Br. 4-5.) However, at oral argument the Town conceded that the Planning Board did not apply QLO § 6.1 to the standing analysis, bypassed the QLO entirely, and instead conducted the standing analysis exclusively under the grandfathering provisions of the LUZO. The Court therefore need not address the Town's argument. *See In re Estate of Kingsbury*, 2008 ME 79, ¶ 7 n.3, 946 A.2d 389; *Webster v. Me. Bd. of Evt'l Prot.*, No. AP-98-031, 1999 Me. Super. LEXIS 146, *3 (May 19, 1999). Even if the argument is considered, it still fails for the reasons stated herein. The terms used in section 6.1 are defined and understood by reference to the QLO only, not the LUZO.

[10] Section 6.1 also uses the phrase "active operation." For the reasons discussed above, the phrase "active operation" means existing operation, *i.e.* an operation that is not new or proposed, recurring, or an expansion.

9

437 (Me. 1991) ("a word is known by the company it keeps") (citing *Gregory v. Ashcroft*, 501 U.S. 452, 465 (1991)). As previously discussed, "existing quarrying activities" mean quarrying activities that are not new or proposed, recurring, or expansions. According to section 6.1, whether quarrying activities are existing—as opposed to new, proposed, recurring, or expansions—must be measured as of the QLO's effective date.[11] The word "un-licensed" should be given its customary and usual meaning, to mean an activity that has not been licensed. *See* QLO Article 11. It follows, therefore, that the phrase "active un-licensed" as applied to quarrying activity, means existing quarrying activities as of the QLO's effective date[12] that have not been licensed by the Town. Article 6 and section 6.1 nowhere use or refer to the terms "non-conforming use," "grandfathered," or "legally existing."

In both cases (sections 5.1 and 6.1), the license application process is very similar and very extensive. Both application categories require thorough site plans; traffic impact studies; soil erosion and sedimentation control plans; storm water management plans; spill prevention, control and containment plans; blasting plans; closure plans; and landscaping plans. QLO §§ 5.1, 6.1. Applications for new, expanded, or reoccurring quarrying activities additionally require such items as location of historical or archaeological sites, wildlife impact studies, proof of technical and financial capacity, and so forth. QLO § 5.1. Both categories of quarrying activities (new, expanded, or re-occurring quarrying activities on the one hand, and existing quarrying activities on the other hand) are subject to similar and rigorous performance standards, which the Intervenors

---

[11]Thus, for example, recurring quarrying activities are those that had ceased for more than the 12 months prior to the QLO's effective date, or were otherwise inactive as of the QLO's effective date, and for which the applicant seeks to restart quarrying activities. Existing quarrying activities are those that had not ceased for more than the 12 months prior to the QLO's effective date, or were not otherwise inactive as of the QLO's effective date.

[12] Any cessation caused by the Moratorium Ordinance must be disregarded in the analysis.

conceded at oral argument impose a greater restriction upon the use of the land then do the performance standards of the LUZO. *See* QLO §§ 5.2, 6.2.

Section 2.8 of the QLO, entitled "Conflict with Other Ordinances," provides:

> This Ordinance shall in no way impair or remove the necessity of compliance with any other rule, regulation, bylaw, permit or provision of law. It is anticipated that the application will be reviewed concurrently with this ordinance and the requirements of the Land Use Zoning Ordinance. Where this Ordinance imposes a greater restriction upon the use of the land, buildings or structures, than any other rule, regulation bylaw, or provision of law, the provisions of this Ordinance shall prevail.

Since the second sentence of section 2.8 specifically identifies the LUZO, and because the Planning Board did not apply any other rule, regulation, bylaw, permit or provision of law in its analysis,[13] the Court now turns its attention to the LUZO.

The LUZO regulates generally the use of all lands and waters in the Town. *See* LUZO § 1.5. The definition section of the LUZO defines "Mineral Extraction," but it does not define "Quarry" or "Quarrying." *See* LUZO § 8. The LUZO has no provisions which address a Quarrying License, or any other form of license. The LUZO contains performance standards that apply to many forms of activities and land uses, but section 6B.12 of the performance standards, entitled "Mineral Extraction and Exploration," states that "Quarrying activities are regulated by the Town of Mount Desert Quarrying License Ordinance." Section 3.4 of the LUZO, entitled "Permitted, Conditional, and Excluded uses by District," does not mention quarrying at all. Nothing in the LUZO appears on its face to apply to quarrying activities.

---

[13] Although the second sentence of section 2.8 clearly mentions the LUZO, the first and third sentences reference "other" provisions of law. The Court concludes the first and third sentences should be read in tandem, to wit: other provisions of law—not including the LUZO—apply, unless a provision of the QLO imposes a greater restriction upon the use of the land, buildings, or structures. The LUZO is not subject to this "greater restriction" caveat; the requirements of the QLO and LUZO are reviewed concurrently. Article 11 of the QLO somewhat differently states that in the event of a conflict with any "other" provision of law, the "stricter language" will apply for purposes of "this division." The "stricter language" provision of Article 11 should be read in conjunction with the first and third sentences of section 2.8. No party has made any argument based on the "greater restriction" or "stricter language" provisions of section 2.8 or Article 11, and thus the Court need not address any such argument.

11

Section 4 of the LUZO addresses "Non-conformities" generally, and Section 4.4 applies specifically to "Non-conforming Uses." Section 8 of the LUZO defines a "Non-conforming Use" as the "[u]se of buildings, structures, premises, land or parts thereof which is not allowed in the district in which it is situated, but which is allowed to remain solely because it was in lawful existence at the time this Ordinance or subsequent amendments took effect." According to section 4.4(2) of the current LUZO (amended May 8, 2018), non-conforming uses which have been discontinued for a period exceeding one year (in the Shoreland Zone) or two years (outside the Shoreland Zone), "may not again be devoted to a non-conforming use except that the Planning Board may, for good cause shown by the applicant, grant up to a one-year extension to that time period." Prior versions of section 4.4 of the LUZO (amended May 2, 2017, May 4, 2010, and November 16, 2009) did not distinguish between non-conforming uses within or without the Shoreland Zone, and provided simply that non-conforming uses discontinued for a period exceeding one year could not be resumed without a good cause extension by the Planning Board. Section 4.4 of an even earlier version of the LUZO (amended May 5, 2009) used somewhat different language and provided that if a nonconforming use ceased for a continuous period of 18 months, it could not be resumed unless the Planning Board found a longer delay was not unreasonable and not caused by the neglect of the owner. The Court understands that LUZO section 4.4 contains what the Planning Board referred to in its June 13, 2017 decision as the "grandfathering standards." No version of LUZO section 4.4 mentions quarry, quarrying, or quarrying activities.

Section 5 of the LUZO applies to conditional uses. In contrast to a non-conforming use, section 8 of the LUZO defines a "conditional use" as: "A use which by its nature in a particular zoning district requires case by case determination to assure compliance with the provisions of this

12

Ordinance and avoidance of harm to public or private interests." According to section 5, a person who wants to establish or expand a conditional use must apply to the Planning Board, which will then engage in a review process.

Neither the QLO nor the LUZO uses the term "standing."

Harmonizing the QLO and the LUZO

The QLO by its terms applies comprehensively to the regulation of quarrying activities. Indeed, following the moratorium, the Town developed the QLO specifically in response to the need to adopt a regulatory framework to govern quarrying activities. As the Town officially noted in its Moratorium Ordinance, the LUZO was "grossly inadequate" to regulate quarrying. As the Moratorium Ordinance indicates, one option the Town considered was substantially amending the LUZO to make it the source of quarrying regulation. The Town did not pursue that option. Instead, the Town enacted the QLO, and made the QLO—rather than the LUZO—the primary source of quarrying regulation. The amendment to the LUZO (specifying that quarrying activities are regulated by the QLO) adopted as part of enacting the QLO demonstrates that the Town intended the QLO to be the primary source of quarrying regulation.

The QLO has two overarching purposes. The first purpose is to "put into law minimum removal and reclamation standards and municipal procedures to regulate the quarrying of rock or stone." QLO § 1.2. These standards and procedures are intended to protect water quality, preserve the Town's natural resources and property values, and control potential pollution. Simultaneously, the second purpose of the QLO is to "respect[] the rights of pre-existing operations." QLO § 1.2.

The QLO explicitly applies to all quarrying activities across the spectrum of time: past, present, and future. By specifying that the QLO applies to quarrying activities that are new or proposed, recurring, expansions, or existing, section 2.4 of the QLO subsumes and replaces—for

13

quarrying activities—the nonconforming use and grandfathering provisions of the LUZO. For quarrying activities, section 2.4(2) of the QLO functionally takes the place of section 4.4(2) of the LUZO. According to section 3.1 of the QLO, only the conditional use provisions of the LUZO are carried over into the QLO, and only for quarrying activities that are exempt from the QLO.

Only the QLO has provisions (sections 5.1 and 6.1) that on their face apply to applications for a Quarrying License. The LUZO has no such provisions. Section 5.1 of the QLO comprehensively describes what is required in order to apply for a Quarrying License for recurring quarrying activities. Section 6.1 of the QLO comprehensively describes what is required in order to apply for a Quarrying License for existing quarrying activities. Neither section 5.1 nor section 6.1 mention or refer to the nonconforming use or grandfathering provisions of the LUZO. Neither section 5.1 nor 6.1 mention the word "standing," nor do they refer to any prerequisite in the LUZO or elsewhere that must be satisfied in order to file a Quarrying Application. The LUZO states that "quarrying activities" are regulated by the QLO. The QLO imposes performance standards on quarrying activities that constitute a greater restriction on the use of the land than the general performance standards of the LUZO. The LUZO explicitly states its performance standards do not apply to quarrying activities. The QLO in its definitional section expressly defines "Quarry" and "Quarrying;" the LUZO in its definitional section does not. Thus, based on the history, purpose, plain language, and structure of the QLO, the Planning Board should have used the provisions of QLO § 6.1 to review MacQuinn's quarrying application, and not imposed the nonconforming use and grandfathering provisions of the LUZO as a threshold standing requirement.

The Town bases the gravamen of its argument to the contrary on section 2.8 of the QLO. The second sentence of section 2.8 states: "It is anticipated that the [Quarrying License] application

14

will be reviewed concurrently with this ordinance and the requirements of the Land Use Zoning Ordinance." Based on that language, the Town argues the Planning Board was required to use the non-conforming use and grandfathering provisions of the LUZO to deny MacQuinn standing to apply for a Quarrying License under the QLO. In other words, the Town argues the concurrent review anticipated by section 2.8 imports a threshold standing requirement from the LUZO for Quarrying License applications under section 6.1 of the QLO. For several reasons, the Court disagrees and concludes the Planning Board misreads the concurrent review contemplated by section 2.8 of the QLO.

First, it must be noted that the Planning Board did not review MacQuinn's Quarrying License application concurrently under both the QLO and the LUZO. Rather, the Planning Board conducted its analysis first and exclusively under the non-conforming use and grandfathering provisions of the LUZO.[14] This point is important, because it undermines the Town's standing argument. Standing is a threshold concept; it comes preliminary to something else. *See Roop v. City of Belfast*, 2007 ME 32, ¶ 8, 915 A.2d 966 ("standing threshold"). The basic premise underlying the doctrine of standing is to "limit access." *Id.* ¶ 7. Thus, the very nature of standing connotes sequential review, not concurrent review. Interpreting section 2.8 and the LUZO to create a standing requirement that limits who can apply for a Quarrying License under section 6.1, therefore, violates the concurrent review anticipated by section 2.8.[15]

Second, not only does the Planning Board's reliance on the non-conforming use and grandfathering provisions of the LUZO to create a preexisting standing requirement run contrary

---

[14] As mentioned earlier, the Town does not dispute this fact, and indeed it is beyond dispute. But the extent to which the Planning Board remained improperly anchored to the LUZO can be seen by its use of the phrase "quarrying permit" in its June 13, 2017 decision. The QLO uses the phrase Quarrying License, not quarrying permit.

[15] Further, the definition of "quarrying" adopted by the Planning Board at its June 13, 2017 meeting is inconsistent with the QLO's definition of "quarrying," and the ad hoc manner in which the Planning Board attempted to amend the QLO's definition of "quarrying" runs afoul of the QLO's amendment process. *See* QLO Article 9.

15

to the history, purpose, plain language, and structure of the QLO; as discussed above, construing section 2.8 and the non-conforming use and grandfathering provisions of the QLO to create a preexisting standing requirement renders section 6.1 of the QLO mere surplusage. *See Home Builders Ass'n of Me., Inc. v. Town of Eliot*, 2000 ME 82, ¶¶ 7-8, 10 750 A.2d 566 ("[I]t is well established that nothing in a statute may be treated as surplusage if a reasonable construction supplying meaning and force is otherwise possible . . . . Surplusage occurs when a construction of one provision of a statute renders another provision unnecessary or without meaning or force."). The same rule applies when construing municipal ordinances.[16] *Id.* Courts should not read a statute or, in this case, an ordinance, to conflict with another ordinance when an alternative, reasonable interpretation yields harmony provided that the interpretation is supported by the plain language of the ordinance. *Pinkham v. Morrill*, 622 A.2d 90, 95 (Me. 1993); *cf. Opinion of the Justices*, 311 A.2d 103, 108 (Me. 1973). Courts are guided in this endeavor with an eye to the overall municipal purpose behind the two ordinances. *Cf. Pinkham*, 622 A.2d at 95.

In this case, the history, purpose, plain language, and structure of the QLO establish that section 6.1 of the QLO governs who is eligible for a Quarrying License for existing quarrying activities, and section 4.4 of the LUZO (*i.e.* the non-conforming use and grandfathering provisions) governs who has standing to apply for non-conforming use permits for land use activities other than quarrying. Section 6.1 of the QLO and section 4.4 of the LUZO are not in conflict; they apply

---

[16] In *Home Builders Ass'n*, the Law Court explicitly applied a canon of statutory construction to interpret a municipal ordinance. *Id.* As a general principle, the "rules of statutory construction apply equally to the interpretation of municipal ordinances and charters." *Inhabitants of South Portland v. Fickett*, No. CV-91-1144, 1991 Me. Super. LEXIS 208, *3 (Sep. 20, 1991) (citing *Sutherland Statutory Construction* § 30.06 (4th ed. 1985)).

to different activities. Under this interpretation, no provision of either ordinance is rendered mere surplusage.[17]

The Town and Intervenors nevertheless argue that failure to superimpose a standing requirement on section 6.1 of the QLO would mean anyone can claim they have existing quarrying activity, regardless of whether such activity was "lawful" or "permitted" under the LUZO prior to enactment of the QLO. The argument, however, is undermined by the text of the Moratorium Ordinance, which explicitly states the LUZO was inadequate to regulate quarrying activity. Rather than step into the quagmire of "lawful" pre-existing use under a woefully inadequate LUZO, the Town smartly took a different approach. As made clear in QLO section 1.2, the QLO's well-developed "standards and procedures" are intended to protect the public, not a standing requirement carried over from the LUZO. Any pre-existing quarrying operation can apply for a Quarrying License, provided it can meet section 6.1's application requirements and comply with section 6.2's performance standards. A casual, backyard quarrying operation, is unlikely to be able to satisfy the extensive application requirements of QLO § 6.1, or comply with the intensive performance standards of QLO § 6.2. A larger, more sophisticated quarrying operation might be able to satisfy sections 6.1 and 6.2, but in that case the public would, by definition, be protected. And in any event, as conceded at oral argument no other applicants have "pop[ped] up out of the woods" to apply for a Quarrying License for existing quarrying activity.

Third, the QLO was developed after the LUZO, and specifically to address issues related to quarrying that the LUZO was inadequate to address. *See Fleet Nat'l Bank v. Liberty*, 2004 ME 36, ¶ 21, 845 A.2d 1183 (quoting 2B *Sutherland Statutory Construction* § 51.02 at 193-94 (6th ed. 2000)) ("Where two statutes deal with the same subject matter, the more recent enactment prevails

---

[17] And QLO § 2.8 continues to have application, although not in the manner contemplated by the Planning Board in this case; *see infra.*

as the latest expression of legislative will."); *Kimball v. Land Use Regulation Comm'n*, 2000 ME 20, ¶ 22 n. 13 (citing 2B *Sutherland Statutory Construction* § 51.02, at 193-94 (6th ed. 2000)). If the Town had wanted to import nonconforming use and grandfathering considerations of the LUZO into QLO § 6.1, it could have done so, just as the Town did by importing conditional use considerations into QLO § 3.1. It did not, and thus the concurrent review anticipated by Section 2.8 cannot reasonably be construed as a means to deny MacQuinn standing based on pre-existing provisions of the LUZO that are not found in the more recent enactment of the QLO and section 6.1.

Fourth, the QLO addresses a very specific topic—quarrying activities—rather than the general land use topics encompassed by the LUZO. "As a familiar principle of statutory construction, specific statutes prevail over general ones when the two are inconsistent." *Houlton Water Co. v. Me. Pub. Utils. Comm'n*, 2016 ME 168, ¶ 21, 150 A.3d 1284 (citing 2B Singer & Singer, *Sutherland Statutory Construction* § 51.2 at 174 (7th ed. 2012)); *see also Estate of Footer*, 2000 ME 69, ¶ 8, 749 A.2d 146; *Butler v. Killoran*, 1998 ME 147, ¶ 11, 714 A.2d 129 (citing 2B *Sutherland Statutory Construction* § 51.05 at 174 (1992 & Supp. 1998)) ("We are mindful of the general principle of statutory construction that a statute dealing with the subject specifically prevails over another statue dealing with the same subject generally."). The QLO is an ordinance specific to quarrying. The LUZO applies generally to land use. Moreover, one of the twin purposes of the QLO is to respect the rights of pre-existing operations. Since there are no indications the Town intended the general non-conforming use and grandfathering provisions of the LUZO to limit access of pre-existing quarrying operations to the specific application procedures of QLO § 6.1, section 2.8 cannot be interpreted to create a standing requirement. *See Butler*, 1998 ME 147, ¶ 11, 714 A.2d 129.

18

Nothing in this decision undermines the concurrent review anticipated by section 2.8 of the QLO. The Planning Board is still expected to review Quarrying License applications concurrently under both the QLO and the LUZO. However, only those provisions of the LUZO which (1) do not conflict with the QLO, (2) are not otherwise inconsistent with the QLO, and (3) do not render any provision of the QLO surplusage should be applied. *See Pinkham*, 622 A.2d at 95; *Fleet Nat'l Bank*, 2004 ME 36, ¶ 21, 845 A.2d 1183; *Houlton Water Co.*, 2016 ME 168, ¶ 21, 150 A.3d 1284; *Home Builders Ass'n of Me., Inc.*, 2000 ME 82, ¶¶ 7-8, 10 750 A.2d 566. At a minimum, *e.g.*, section 3.1 of the QLO indicates it may be appropriate for the Planning Board to review and apply the conditional use standards of section 5 of the LUZO. Beyond that example, it is not necessary for the Court to scour the LUZO to see what other provisions might apply, since only the question of standing as it pertains to QLO § 6.1 has been raised in this matter.

### Planning Board Decision

The Planning Board erred as a matter of law on June 13, 2018, when it relied on the nonconforming use and grandfathering provisions of the LUZO to define quarrying and to deny MacQuinn standing to apply for a Quarrying License. QLO § 2.8 and the nonconforming use and grandfathering provisions of the LUZO do not create a standing requirement limiting who can apply for a Quarrying License under section 6.1 of the QLO. The Planning Board should have applied the provisions of section 6.1 of the QLO, as those are discussed herein, and without reference to the nonconforming use and grandfathering provisions of the LUZO, in order to determine MacQuinn's eligibility for a Quarrying License.

On remand, the question for the Planning Board is whether, under section 6.1 of the QLO, as discussed herein and without reference to the non-conforming use and grandfathering provisions

19

of the LUZO, MacQuinn is eligible for a Quarrying License for any active un-licensed quarry activity.

## CONCLUSION

Based on the foregoing it is hereby ORDERED:

That the Planning Board's June 13, 2017 standing determination is reversed, and this matter is remanded to the Planning Board to determine MacQuinn's eligibility for a Quarrying License pursuant to QLO § 6.1 in a manner consistent with this decision.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).


Dated: 10-12-2018

_MA Duddy_
Michael A. Duddy
Judge, Business & Consumer Docket


Entered on the Docket: 10-15-18
Copies sent via Mail ___ Electronically ✓

20