STATE OF MAINE
CUMBERLAND, ss.
BUSINESS & CONSUMER DOCKET
DOCKET NO. BCD-AP-2018-06

FRIENDS OF LAMOINE, et al.,                )
                                            )
        Plaintiffs,                         )
                                            )
    v.                                      )
                                            )        ORDER GRANTING IN PART AND
TOWN OF LAMOINE,                            )        DENYING IN PART HAROLD
                                            )        MACQUINN, INC.'S MOTION FOR
        Defendant.                          )        RECONSIDERTION OR TO ALTER OR
                                            )        AMEND THE JUDGMENT
                                            )
                                            )
HAROLD MACQUINN, INC.,                      )
                                            )
        Party in Interest.                  )

On April 4, 2019, this Court issued an Order on 80B Appeal (the "Order") granting the appeal in this case brought by Plaintiffs Friends of Lamoine and Jeffrey Dow, as Trustee for the Tweedie Trust ("Friends") pursuant to M.R. Civ. P. 80B. The practical result of the Court's Order was to prevent Party in Interest Harold MacQuinn, Inc. ("MacQuinn") from expanding an existing gravel pit in the Town of Lamoine (the "Town"). MacQuinn now seeks reconsideration of the Order on two grounds.

First, MacQuinn argues the Court should have addressed the question of whether the Board of Appeals ("BOA") erred by conducting an appellate review of the Planning Board's decision under the Site Plan Review Ordinance ("SPRO"). Although it appeared to the Court that MacQuinn was simply noting and preserving the issue for possible future argument, *see* Rule 80B Brief of Party In Interest Harold MacQuinn, Inc., page 14, fn. 11, the Court grants MacQuinn's request and addresses the issue herein. For the reasons discussed below, the

1

Court concludes that the BOA did not err in conducting an appellate review of the Planning Board's SPRO decision.

Second, MacQuinn argues the Court should have determined the Planning Board erred in failing to waive the criteria of section J.1 of the SPRO. In particular, MacQuinn takes exception to the Court relying on unstated but implicit findings regarding Cousins Hill in order to affirm the Planning Board's decision.[1] Upon reconsideration, the Court concludes it was unnecessary for the Court to rely on implicit findings regarding Cousins Hill. In the process, the Court also revises its determination that the Planning Board's finding regarding the isolated wetland was not supported by substantial evidence. The Court therefore vacates that portion of the Order based on implicit findings regarding Cousins Hill, and further vacates that portion of the Order concluding the Planning Board erred with regard to the isolated wetland.[2] For the reasons stated below, the Court still concludes the Planning Board was not required to waive the criteria of section J.1, and therefore the Planning Board did not err in denying MacQuinn's application for a permit under the SPRO.

The Court addresses each of MacQuinn's reconsideration arguments in order.

APPELLATE REVIEW

MacQuinn argues that the Board of Appeals erred in conducting an appellate review

---

[1] In reliance on *Christian Fellowship & Renewal Center v. Town of Limington*, 2001 ME 16, ¶ 19, 769 A.2d 834, MacQuinn contends that because the Planning Board made some findings, and there was no procedure in place for MacQuinn to ask for additional or alternative findings, the Court erred by inferring subsidiary facts from the record. The Court does not necessarily agree that on the facts of the current case *Christian Fellowship* prohibits the Court from making implicit findings readily ascertainable from the record. *See Forester v. City of Westbrook*, 604 A.2d 31, 32-33 (Me. 1992). However, the Court does agree on reconsideration that relying on implicit findings was unnecessary given the Planning Board's explicit findings—and the better approach is to decide the case based on those explicit findings.

[2] Thus, pages 14 – 19 of the Order, including up to the first full paragraph of page 20, are vacated and replaced with the discussion of section J.1 in this Order on Reconsideration.

of MacQuinn's application under the SPRO, as opposed to a de novo hearing,[3] which the BOA held for MacQuinn's application under the Gravel Ordinance. (Pl.'s Ex. O.2.) For reasons explained in the Order, the BOA's decision to conduct an appellate review under the SPRO means that this Court considered the decision of the Planning Board directly rather than the decision of the Board of Appeals. *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773. Upon reconsideration, MacQuinn asks the Court to remand the case to the BOA with instructions to hold a de novo hearing on MacQuinn's application under the SPRO. *See id.* ¶ 15. For the reasons discussed below, the Court declines the request.

MacQuinn's argument is based on 30-A M.R.S. § 2691(3)(C), which provides:

> Unless otherwise established by charter or ordinance, the board [of appeals] shall conduct a de novo review of any matter before the board [of appeals] subject to the requirements of paragraph D. If a statute or ordinance establishes an appellate review process for the board [of appeals], the board [of appeals] shall limit its review on appeal to the record established by the board or official whose decisions is the subject of the appeal and to the arguments of the parties. The board may not accept new evidence as part of an appellate review.

*Id.* The basic rule of 30-A M.R.S. § 2691(3)(D) is thus that unless a local ordinance limits the authority of an appeals board to appellate review, the appeals board is required to undertake a de novo review. *See, e.g., Stewart*, 2000 ME 157, ¶ 7, 757 A.2d 773; *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 8, 868 A.2d 161. "A municipality may, however, by ordinance, provide that its Board of Appeals hear appeals in a solely appellate capacity in certain instances." *Stewart*, 2000 ME 157, ¶ 8, 757 A.2d 773.

---

[3] "[A] hearing de novo means a new presentation of facts for consideration by a tribunal independent of any prior decision. 'On hearing "de novo" court hears matter as court of original and not appellate jurisdiction.'" *Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 7 n.2, 757 A.2d 773 (quoting Black's Law Dictionary 721 (6th ed. 1990)).

MacQuinn argues that Lamoine lacks an ordinance provision limiting the authority of the BOA to appellate review, and that 30-A M.R.S. § 2691(3)(C) thus requires the BOA to conduct a de novo review. Friends responds that the BOA correctly determined that the SPRO provision providing for appeals to the appellate board limits the BOA to an appellate review of the Planning Board's decision.

The relevant provision, section M of Lamoine's SPRO (Pl.'s Ex. O-7), governs appeals from decisions of the Planning Board disapproving or placing conditions on applications submitted under the SPRO. (SPRO § M.1.) Section M.1 describes the role of the Board of Appeals in relevant part as follows:

> If the [planning] board disapproves an application or grants approval with conditions that are objectionable . . . or when it is claimed that the provisions of this section do not apply, or that the true intent and meaning of the ordinance has been misconstrued or wrongfully interpreted, the applicant . . . may appeal the decision of the board as follows:
> a. [. . .]
> b. Appeals involving administrative procedures or interpretation of this ordinance may be heard and decided by the board of appeals as detailed below.
> c. When errors of administrative procedure are found by the appeals board, the case shall be referred back to the [planning] board for rectification.
> d. When errors of interpretation are found, the board of appeals may modify the interpretation or reverse the order of the [planning] board but may not alter the conditions attached by the [planning] board. All changes in conditions, other than changes made by the granting of a variance, shall be made by the [planning] board in accordance with the board of appeals' interpretation.
> e. Appeals involving conditions imposed by the [planning] board, or a decision to deny or approve, shall be made to the Superior Court, when such appeals do not involve administrative procedures and interpretation which shall first be heard and decided by the board of appeals, as detailed above.

4

(SPRO § M.1.) The Planning Board did not grant MacQuinn's SPRO permit application with conditions, but rather denied the application outright. Section M of the SPRO thus limits appeal to the BOA to errors of administrative procedure or errors in the Planning Board's interpretation of the ordinance.

MacQuinn argues that the section M.1 restrictions merely narrow the jurisdiction of the BOA but have no bearing on whether the review of decisions within its ambit should be de novo or appellate. In other words, MacQuinn argues that the limitation on the BOA to review only for errors of administrative procedure and errors of interpretation is not the same as saying the BOA is limited to an appellate review of those errors, meaning that the default rule of de novo review comes into play under 30-A M.R.S. § 2691(3)(C). Friends responds that section M, by limiting review by the BOA to errors of administrative procedures or errors in the interpretation of the ordinance, effectively requires that the BOA "limit its review on appeal to the record established by" the Planning Board because it is only authorized to review Planning Board decisions for legal errors. *See* 30-A M.R.S. § 2691(3)(D); SPRO § M.1. The Court agrees with Friends.

The Law Court has had occasion to address this issue multiple times in recent years. For example, in *Stewart v. Town of Sedgwick*, 2000 ME 157, 757 A.2d 773, the Law Court held that "the Town of Sedgwick had not enacted an ordinance specifically providing for purely appellate hearings" in the circumstances of that case. *Id.* ¶ 11. The ordinance at issue in that case provided that the Board of Appeals "may reverse the decision . . . of the Code Enforcement Officer or Planning Board only upon a finding that the decision . . . was clearly contrary to specific provisions of this Ordinance." (quoting Sedgwick Shoreland Zoning Ordinance § 16(I)(3)(b)(2)). *Id.* n. 5. As the Law Court noted, this language "implies that the

Board [of Appeals] may act as an appellate body[.]" *Id.* ¶ 11. However, the ordinance also provided that "[t]he person filing the appeal shall have the *burden of proof*" and that "[a]ll decisions shall . . . include a statement of *findings* and conclusions. . . ." *Id.* n. 6 (quoting Sedgwick Shoreland Zoning Ordinance § 16(I)(3)(b)(3)-(5) (emphasis in opinion)). The Law Court noted that this language "suggests that a hearing de novo will occur." *Id.* ¶ 11. In light of this "confusion," the Law Court held that "[b]ecause the Ordinance fails to provide explicit guidance, 30-A M.R.S.A. § 2691 applies to require that the Board undertake a de novo review of the application." *Id.* ¶¶ 1, 11. *See also Harding v. City of Biddeford Planning Bd.*, No. AP-07-48, 2008 Me. Super. LEXIS 104, *6-9 (May 20, 2008).

Since *Stewart* was decided, however, the Law Court has held that an ordinance provision that "suggests" de novo review does not foreclose the possibility that under certain circumstances the authority of a board of appeals is limited to acting in an appellate capacity. For example, in *Yates v. Town of Southwest Harbor*, 2001 ME 2, 763 A.2d 1168, the Law Court noted that certain provisions of Southwest Harbor's board of appeals ordinance were "[l]ike the Sedgwick zoning ordinance" because they required the board of appeals decision to include a statement of findings of fact and placed the burden of proof with the appellant. *Id.* ¶ 12. However, unlike the ordinance in *Stewart*, Southwest Harbor's land use ordinance allowed the board of appeals "to hear and decide appeals where it is alleged that there is an error in any order, requirement, decision, or determination made by, or failure to act by, the code Enforcement Officer or Planning Board in the administration of [the land use] Ordinance." *Id.* ¶ 13 (quoting Southwest Harbor Land Use Ordinance § VIII(B)(1) (June 29, 1992)). The Law Court held that this language limited the board of appeals to appellate review of decisions made by the planning board or the code enforcement officer under the

6

land use ordinance, notwithstanding any confusion engendered by the "Sedgwick-like" language in the board of appeals ordinance that required a remand under the facts of *Stewart*. *Yates*, 2001 ME 2, ¶¶ 12-14, 763 A.2d 116; *c.f. Stewart*, 2000 ME 157, ¶¶ 11, 15, 757 A.2d 773. *See also Mills v. Town of Eliot*, 2008 ME 134, ¶ 15, 955 A.2d 258; *Gensheimer*, 2005 ME 22, ¶ 11, 868 A.2d 161.

The Court concludes that section M of the SPRO explicitly directs the BOA to conduct an appellate, rather than de novo, review of Planning Board decisions of applications under the SPRO. By limiting the BOA to deciding "errors of interpretation," and sending back to the Planning Board any "changes in conditions," section M of the SPRO limits the BOA to appellate review. Unlike in *Stewart*, section M lacks any countervailing language suggesting the BOA could conduct a de novo review. As in *Yates*, the SPRO provision governing appeals to the BOA limits such appeals to legal error: "When errors of interpretation are found, the board of appeals may modify the interpretation or reverse the order . . . but may not alter the conditions attached by the [planning] board. All changes in conditions . . . shall be made by the [planning] board in accordance with the board of appeals' interpretation." (SPRO § M.1.d.) If anything, this language is even more explicit than the ordinance at issue in *Yates* limiting the board of appeals' function to discerning legal error. *C.f. Yates*, 2001 ME 2, ¶¶ 13, 763 A.2d 116 (quoting Southwest Harbor Land Use Ordinance § VIII(B)(1) (June 29, 1992)).

Contrary to MacQuinn's arguments, the language of section M is sufficiently detailed and clear to overcome the section 2691(3)(D) call for de novo review. And section M's language is not just jurisdictional, as MacQuinn argues. The language of section M limits the BOA's review for errors to the record established by the Planning Board. This result is consistent with the Law Court's construction of very similar language in *Yates*, 2001 ME 2,

¶¶ 12-14, 763 A.2d 116; *Mills*, 2008 ME 134, ¶ 15, 955 A.2d 258; and *Gensheimer*, 2005 ME 22, ¶ 11, 868 A.2d 161. It is not necessary that the ordinance use the actual words "appellate review."

Finally, MacQuinn raises the policy argument that any construction of section M of the SPRO that does not require de novo review results in absurd, or at least inconsistent, results. MacQuinn points specifically to the circumstances of this case, where two different municipal boards reached different factual conclusions on a similar body of evidence. There are two problems with MacQuinn's argument. First, as MacQuinn concedes in its memorandum in support of the instant motion, "[i]f section M.1 of the SPRO were clear, then the Court would have to accept this result, absurd as it may be." (MacQuinn Mot. Recon. 7.) In this case, section M.1 is clear, and so the Court must accept the result. Second, as explained in the next section, the result is not absurd. It is a perfectly reasonable outcome for MacQuinn to have been issued a permit under the Gravel Ordinance, and yet be denied a permit under the SPRO. Given the difference in the scope and purposes of the two ordinances, the results are not inconsistent.

## SECTION J.1 CRITERIA

In order to determine whether the Planning Board erred by failing to waive the criteria of section J.1 of the SPRO, it is necessary to step back and compare the purpose and provisions of the Gravel Ordinance with those of the SPRO.[4] The interpretation of a municipal ordinance is a question of law subject to de novo review. *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293. "Although the terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the

---

[4] The versions of the Gravel Ordinance and SPRO applicable to this case are found at Pl.'s Exs. O-2 and O-7.

general structure of the ordinance as a whole," courts must look first to the plain language of the provisions to be interpreted. *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 22, 868 A.2d 161 (quotations omitted). Thus, the Court turns to the key provisions of the Gravel Ordinance and the SPRO.

The scope of the Gravel Ordinance is limited to regulating gravel pit activities. Section 1 of the Gravel Ordinance states the purposes of the ordinance are to "define and regulate the excavation, extraction, processing, storage and transportation of sand, gravel, crushed stone, soil and loam" in order to protect public health, safety and welfare; conserve the natural beauty of the Town; prevent erosion; and improve the site's aesthetic appeal and ability to support wildlife. According to section 7.D, the Planning Board must grant a permit if it makes a positive finding based on seven short, one or two-line information requirements. Section 5 provides that the Gravel Ordinance "shall not repeal, annul, or in any way impair or remove the necessity of compliance with any other rule, regulation, by-law, permit, or provision of law."[5]

The SPRO is one such "other rule, regulation, by-law, permit, or provision of law." In contrast to the narrow focus of the Gravel Ordinance, the scope and purposes of the SPRO are broad. According to section G, the SPRO is applicable to a wide range of land uses, including removing earth materials. Section F provides that the purposes of the SPRO are to promote the health, welfare and safety of residents; balance the rights of landowners with the corresponding rights of abutting and neighboring landowners to live without undue disturbances; and implement the policies contained in the Town's Comprehensive Plan.

---

[5] Section 5 goes on to state that if the provisions of the Gravel Ordinance "impose a higher standard for the promotion and protection of health, safety, and welfare, the provisions of this Ordinance shall prevail."

Unlike section 7.D of the Gravel Ordinance, sections J and K of the SPRO set forth seventeen and a half pages of restrictive review standards, which section L suggests should be strictly applied. Section C provides that in the event the SPRO conflicts with or is inconsistent with any other ordinance, the more restrictive provision shall apply.

Based upon the plain language and general structure of the SPRO, the provisions of the SPRO constitute a regulatory overlay, i.e. the provisions of the SPRO apply in addition to the provisions of any other land use ordinance targeting the specific land use in question.[6] This is explicitly the case with regard to gravel pit operations. Section K of the SPRO provides in bold type: "**All applicable standards of the *Lamoine Gravel Ordinance*, as amended, shall also be met.**" (Emphasis original.) Accordingly, in order to obtain a permit to establish or expand a gravel pit operation, an applicant must satisfy all the applicable requirements of both the Gravel Ordinance and the SPRO.[7]

Because the requirements of the SPRO are so demanding, the SPRO authorizes the Planning Board to waive some of the SPRO's requirements in certain situations. Section I.7 allows the Planning Board to waive submission requirements under narrow circumstances. With regard to the general review standards, section J provides: "The board may waive the criteria presented in this section upon a determination by the board that the criteria are not applicable to the proposed action or upon a determination that the application of these criteria are not necessary to carry out the intent of this ordinance." If the criteria do apply and are necessary, section L provides that the Planning Board "may waive the necessity for

_____

[6] Unless there is a conflict, in which case the more restrictive provisions apply.

[7] This is therefore not a case where the two ordinances must be harmonized or otherwise interpreted in order to determine which ordinance applies. *See Pinkham v. Morrill*, 622 A.2d 90, 95 (Me. 1993). Similarly, this is not a case where the most recent or more specific ordinance prevails over the older or more general ordinance. *See Fleet Nat'l Bank v. Liberty*, 2004 ME 36, ¶ 21, 845 A.2d 1183; *Houlton Water Co. v. Me. Pub. Utils. Comm'n*, 2016 ME 168, ¶ 21, 150 A.3d 1284.

strict compliance with those requirements" if the Board (1) "makes written findings of fact that the applicant will suffer an undue economic or other hardship if the requirements of the site plan review are strictly applied," (2) finds that the public health, safety and welfare won't be compromised, and (3) determines the waiver "will not have the effect of nullifying the effect of site plan review."[8]

The Planning Board's December 11, 2007 "Findings of Fact and Conclusions" under the SPRO consists of three written pages, single spaced, along with a fourth page reflecting a summary of the findings and votes. In the section entitled "General," the Planning Board sets forth reasonably well-developed findings of fact:

> The Applicant has submitted a license application seeking to extract gravel from a 108 acre parcel located at Map 3, Lots 31 and 33. A portion of those lots have previously been licensed for gravel extraction, and received site plan approval. The unpermitted areas at issue are the southern portions of the lots, in an area adjacent to a spring and land owned by Cold Spring Water Company, a public water supply, and near the Lamoine Corner area of Route 184 and Mill Road, a relatively densely-developed area including residences, the Lamoine School, the Lamoine Fire Department, a cemetery and community center. The proposed excavation area is above a large groundwater aquifer that provides potable water to many residents of the Town. The Cold Spring Water Company serves about 50 households and several other properties including the school and fire department.
>
> The proposed excavation will bring industrial gravel extraction to an area very close to the above-referenced locations, substantially increasing the impact upon them. As proposed, the proposed excavation will isolate an existing wetland area at a level substantially higher than its surroundings, placing it at risk. The application as presented does not provide adequate protection against the excavation's threat to the Cold Spring Water Company's public water supply.

---

[8] The Planning Board made no such finding of undue economic or other hardship, and it appears MacQuinn never asked the Planning Board to make such a finding.

(Pl.'s Ex. C-8.). SPRO section J.1, labeled "Preserve and Enhance the Landscape," provides:

> The landscape shall be preserved in its natural state insofar as practicable by minimizing tree removal, disturbance of soil, and retaining existing vegetation during construction. After construction is completed, landscaping shall be designed and planted that will define, soften or screen the appearance of the development and minimize the encroachment of the proposed use on neighboring land uses.
>
> Environmentally sensitive areas such as aquifers, significant wildlife habitat, wetlands, steep slopes, floodplains, historic buildings and sites, existing and potential archaeological sites and unique natural features will be maintained and preserved to the maximum extent.

With regard to section J.1, and based on the findings of fact set forth above, by a 3 to 1 vote, the Planning Board concluded in relevant part as follows:

> The Applicant presented insufficient evidence that the proposed use will preserve the landscape in its natural state as much as practicable, or maintain and preserve the Cold Spring Water Company supply, the aquifer, or the isolated wetland to the maximum extent.

(Pl.'s Ex. C-8.) Based in part on this finding, the Planning Board denied MacQuinn's SPRO permit application. (Pl.'s Ex. C-8.)

In its written decision, the Planning Board stated that it "also considered" other provisions of section J.1, but the Board did nothing more in its decision than quote from the text of section J.1. (Pl.'s Ex. C-8.) The Planning Board made no other or further findings of fact or conclusions of law regarding section J.1. In this Court's prior Order, the Court determined the Planning Board's "also considered" language was supported by implicit findings of fact regarding Cousins Hill readily ascertainable from the record. However, it was unnecessary for this Court to make implicit findings, because as discussed below the

12

Planning Board's explicit findings of fact and conclusions of law provide an adequate basis for appellate review.

Before getting there, however, one additional facet of the Planning Board's findings needs to be addressed. For the reasons explained in the Order with regard to sections J.10 and J.17 of the SPRO, the Court continues to conclude that the Planning Board's findings under section J.1 regarding the Cold Spring Water Company water supply and the aquifer are not supported by substantial evidence. Pursuant to section 7.D.3 of the Gravel Ordinance, the BOA's unappealed decision establishes that MacQuinn's proposed expansion "will not result in water pollution nor affect adversely existing ground water, springs or ponds." The Planning Board's findings to the contrary under section J.1 regarding the Cold Spring Water Company supply and aquifer must therefore be rejected as unsupported by the evidence.

With those matters out of the way, it is now appropriate to examine the Planning Board's two remaining explicit conclusions under section J.1. The two conclusions are as follows: (1) "The Applicant presented insufficient evidence that the proposed use will preserve the landscape in its natural state as much as practicable . . . ." and (2) "The Applicant presented insufficient evidence that the proposed use will . . . maintain and preserve . . . the isolated wetland to the maximum extent." (*See* Pl.'s Ex. C-8.) Both of these findings are grounded in the precise language of section J.1. The first level of analysis focuses on whether the findings are supported by findings of fact, and whether those findings of fact are supported by the record. The second level of analysis addresses MacQuinn's arguments regarding waiver, inapplicability, abuse of discretion, and lack of evidentiary support.

The first sentence of the section J.1 review criteria specifies that: "The landscape shall be preserved in its natural state insofar as practicable by minimizing tree removal,

13

disturbance of soil, and retaining existing vegetation during construction." In its general findings of fact, the Planning Board found that MacQuinn was seeking to expand industrial gravel extraction to a 108-acre parcel situated near "the Lamoine Corner area of Route 184 and Mill Road, a relatively densely-developed area including residences, the Lamoine School, the Lamoine Fire Department, a cemetery and community center." The Planning Board did not expressly find that the expansion would cause trees to be removed and soil disturbed in the parcel, but that point is uncontested. MacQuinn concedes gravel extraction requires the removal of trees and disturbance of soil, and is incompatible with the retention of such natural assets. According to MacQuinn: "It is obvious beyond the need for argument that development and operation of a gravel pit *necessarily* will include tree removals and soil 'disturbance.' It is not merely 'impracticable,' but in fact *impossible* to develop and operate a gravel pit without removing the trees and disturbing the soil." Rule 80B Brief of Party In Interest Harold MacQuinn, Inc., page 27 (emphasis original).

As a result, it can fairly be said that the Planning Board found as a matter of fact that the proposed expansion would lead to the loss of trees and disturbance of soil near "the Lamoine Corner area of Route 184 and Mill Road, a relatively densely-developed area including residences, the Lamoine School, the Lamoine Fire Department, a cemetery and community center." The Planning Board further found the proposed expansion of the industrial gravel operation "will substantially increase the impact" on the developments in the Lamoine Corner area. The Planning Board's findings of fact are all supported by MacQuinn's concession and by substantial evidence in the record, and support the Board's finding under section J.1 that "[t]he Applicant presented insufficient evidence that the proposed use will preserve the landscape in its natural state as much as practicable."

14

Moreover, the Planning Board's concern that failure to maintain the landscape in the area of the proposed expansion in its natural state as much as practicable will adversely impact neighboring landowners is supported by the purposes of the SPRO. (*See* SPRO § F.2 (balancing the rights of landowners); Pl.'s Ex. O-7.)

The third sentence of the section J.1 review criteria provides in relevant part that: "Environmentally sensitive areas such as . . . wetlands . . . will be maintained and preserved to the maximum extent." In its general findings of fact, the Planning Board found that: "As proposed, the proposed excavation will isolate an existing wetland area at a level substantially higher than its surroundings, placing it at risk." (Pl.'s Ex. C-8.) The Planning Board's findings of fact with regard to the wetland are supported by substantial evidence in the record. (*See* Pl's Exs. A at 175-210, 260-280, 613, 615; B-23, B-25; C-14 at 5; Video 11_9_17 Public Hearing—Part 1 at 1:25:47-1:26:14 (testimony of Gordon Donaldson).) Moreover, these findings support the Board's conclusion under section J.1 that "[t]he Applicant presented insufficient evidence that the proposed use will . . . maintain and preserve . . . the isolated wetland to the maximum extent." (*See* Pl.'s Ex. C-8.)

In this Court's prior Order, the Court rejected the Planning Board's finding regarding the wetland, on the grounds that the finding was undermined by the BOA's unappealed finding under section 7.D.3 of the Gravel Ordinance. Section 7.D.3 of the Gravel Ordinance, however, only applies to "water pollution" and "ground water, springs, or ponds." (Gravel Ordinance § 7.D.3, Pl's Ex. O-2.) This provision thus applies to the Cold Spring Water Company private water supply and the public aquifer, but it does not apply to the wetland. Section P of the SPRO defines "wetlands" differently than an "aquifer," "body of water," or "groundwater," and the Planning Board's finding regarding the isolated wetland is not based

15

on water pollution. Further, the Gravel Ordinance doesn't define or even address wetlands.[9] Accordingly, in its prior Order, this Court incorrectly lumped wetland preservation with the private and public water issues addressed by section 7.D.3 of the Gravel Ordinance. On reconsideration, the Court corrects that error, and concludes that the Planning Board's finding with respect to the isolated wetland was a sufficient ground for the Planning Board to deny MacQuinn's application under section J.1 of the SPRO, because that finding is not inconsistent with anything found by the BOA under section 7.D.3 of the Gravel Ordinance and is supported by substantial record evidence.

MacQuinn challenges the Planning Board's decision under section J.1 of the SPRO on a variety of grounds. MacQuinn first argues that the Planning Board should have waived section J.1 as inapplicable, because applying the section J.1 review criteria would make it "impossible for a gravel extraction operation—a perfectly legal use in the zoning district— to exist because it would need to minimize the disturbance of soil or retain existing vegetation . . . ." MacQuinn argues that "overbroad application of section J-1 would lead to the irrational result that the SPRO would effectively prohibit *all* gravel pits, even though the Gravel Ordinance specifically allows them." Rule 80B Brief of Party In Interest Harold MacQuinn, Inc., page 27. As a result, MacQuinn argues that the Planning Board abused its discretion or committed legal error by applying the review criteria of section J.1 to its SPRO permit application.

Determining whether a board has committed an abuse of discretion depends on the "facts and circumstances of the particular case and the governing law." *Sager v. Town of*

---

[9] Notably, the 2014 Gravel Ordinance includes a performance standard pertaining to wetlands. (*See* Pl's Ex. O-3, 2014 Gravel Ordinance § 8.A.4). The 2011 Gravel Ordinance, which applies to this case, omits any discussion of a gravel pit's impact on wetlands. (*See* Pl's Ex. O-2, 2011 Gravel Ordinance).

*Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. *See also Pettinelli v. Yost*, 2007 ME 121, ¶ 11, 930 A.2d 1074 ("Review for an abuse of discretion involves resolution of three questions: (1) are factual findings, if any, supported by the record according to the clear error standard; (2) did the [Board] understand the law applicable to its exercise of discretion; and (3) given all the facts and applying the appropriate law, was the [Board's] weighing of the applicable facts and choices within the bounds of reasonableness."). "It is not sufficient to demonstrate that, on the facts of the case, the decisionmaker could have made choices more acceptable to the appellant or even to a reviewing court." *Sager*, 2004 ME 40, ¶ 11, 845 A.2d 567.

In this case, MacQuinn's waiver argument finds no support in the record, or in the language or structure of the ordinances. According to the Town's Comprehensive Plan, what industrial activity there is in Lamoine "consists primarily of gravel extraction." (Pl's Ex. O-1, pg. 1.) As of the date of the Comprehensive Plan, there were thirteen active gravel pits, "run by some 9 operators." (Pl's Ex. O-1, pg. 42.) More specifically, the existing gravel pit which MacQuinn seeks to expand "received site plan approval." (Pl's Ex. C-8.) Thus, there is no evidence that the Planning Board has applied the section J.1 review criteria to outlaw gravel pits in contravention of the Gravel Ordinance or the Comprehensive Plan.

However, as discussed above, the SPRO provides an overlay of regulation in addition to the Gravel Ordinance, to ensure that new or expanded gravel pits are not located in areas where the landscape should be preserved in its natural state insofar as practical, environmentally sensitive areas such as wetlands should be maintained and preserved to the maximum extent, or neighboring landowners would suffer undue disturbances from nuisances caused by the gravel pit operation. It is clear that gravel extraction operations must satisfy both the Gravel Ordinance and the SPRO. Further, the section J.1 review criteria

are more restrictive than the Gravel Ordinance criteria, and therefore must be applied. Thus, it is a permissible and predictable outcome under the SPRO that gravel extraction operations might not be permitted to expand into some areas of the Town, even if the gravel operations otherwise satisfy the more narrowly focused (but less restrictive) Gravel Ordinance, and even if gravel extraction is generally a permissible use in the zoning district.

According to section J of the SPRO, the Planning Board has discretion to decide whether to waive any of the review criteria as inapplicable or unnecessary. The Board's waiver authority is permissive, and not mandatory. Indeed, the Planning Board waived some of the other section J criteria, thereby demonstrating it understood the law applicable to its exercise of discretion. The Planning Board's findings regarding section J.1 are supported by substantial evidence in the record. Given all the facts and applying the appropriate law, the Planning Board's weighing of the applicable facts and choices was within the bounds of reasonableness. The fact that application of the section J.1 review criteria in this case prevents expansion of MacQuinn's gravel pit into a new area is therefore not grounds to conclude the Planning Board abused its discretion or committed an error of law by failing to waive the criteria and issue the permit.

MacQuinn next argues that the Planning Board misinterpreted section J.1 because, according to MacQuinn, section J.1 only applies during and after construction. Since the gravel pit expansion proposal does not involve any construction, MacQuinn argues, Section J.1 is inapplicable and should have been waived.

In its prior Order, this Court rejected the construction argument as it pertains to the "environmentally sensitive" component of the section J.1 review criteria. *See* pages 20-21 of the Order. The Court did not, however, have occasion to consider MacQuinn's construction

18

argument with regard to the "landscape shall be preserved" component of the section J.1 review criteria. For the reasons discussed below, the Court concludes the full scope of section J.1's directive to preserve the landscape in its natural state insofar as practical is not limited to during construction, and thus the Planning Board did not misinterpret section J.1.

The key language from section J.1 reads as follows: "The landscape shall be preserved in its natural state insofar as practicable by minimizing tree removal, disturbance of soil, and retaining existing vegetation during construction." (SPRO § J.1, Pl's Ex. O-7.) The quoted language constitutes an imperative sentence, because it gives a command. The subject of the imperative sentence is unstated but understood to be the applicant, to wit: "The applicant shall preserve the landscape . . ." The object is "the landscape." The language "in its natural state insofar as practicable" is a phrasal modifier, modifying the noun "landscape." Everything else in the sentence is the predicate, starting with the verb phrase "shall be preserved." The predicate contains three phrases explaining and modifying the preservation requirement: "by minimizing tree removal," "[by minimizing] disturbance of soil," and "[by] retaining existing vegetation during construction." The question is whether in the final verb phrase modifier, the words "during construction" modify only the requirement to "retain[] existing vegetation" or all the preservation requirements.

In this case, the words "during construction" appear at the end of the sentence, not the beginning. Further, there is no comma preceding the phrase "during construction." Accordingly, the phrase "during construction" is anchored to and only modifies the requirement to "retain[] existing vegetation," namely: "The applicant shall preserve the landscape by retaining existing vegetation during construction." *C.f.* Bryan A. Garner, *The Elements of Legal Style* R. 2.24 at 47 (Oxford University Press, 1991)("Anchor Modifiers to

19

What They Modify.")  The phrase "during construction" cannot be read to modify all of the preservation requirements.

In order to achieve the interpretation urged by MacQuinn, the phrase "during construction" would need to have been written into the start of the sentence, and followed by a comma, i.e.:  "During construction, the applicant shall preserve the landscape in its natural state insofar as practical by . . . ."[10]  Alternatively, MacQuinn's interpretation might be plausible, although less convincingly so, had the drafters left the phrase "during construction" in its current location at the end of the sentence, but preceded the phrase with a comma, to wit:  "and retain existing vegetation, during construction." But the drafters did not employ either formulation, and so the sentence was not written in a manner that supports MacQuinn's interpretation.  The applicant's obligation to minimize tree removal and soil disturbance is not limited to during construction. The Court concludes, therefore, that the Planning Board did not misinterpret section J.1.

MacQuinn further argues that the Planning Board's findings under section J.1 are not supported by substantial evidence.  Most of MacQuinn's arguments address the Cold Spring Water Company water supply and aquifer issues, which this Court has already addressed. MacQuinn also challenges whether the "landscaping" provisions of the second sentence of the section J.1 criteria are supported by the evidence, but the "landscaping" provision of section J.1 plays no part in the Court's decision.  MacQuinn does not attack the evidentiary support for the explicit findings the Planning Board made relating to preserving the landscape in its natural state insofar as practical by minimizing tree removal and soil

---

[10] This is exactly the sentence structure employed with regard to the landscaping component of section 7.1, which applies "after construction."

20

disturbance.[11]  Nor does MacQuinn attack the evidentiary support for the explicit findings regarding the isolated wetland.  As discussed earlier, the Court has found these findings supported by substantial evidence in the record.

As to the wetland, MacQuinn contends that the projected impacts are not sufficiently harmful to warrant the Planning Board's denial.  "As to the Planning Board's reference to the 'isolated wetland,' the testimony before the Planning Board showed that MacQuinn's application identified and does not propose any extraction in those areas.  The law does not require more."  (Pl's Ex. C-15, page 4-5)  If by "those areas" MacQuinn means in the wetland itself, MacQuinn is correct.  Its application does not propose extraction from within the wetland itself.  But MacQuinn's application and the evidence in the record demonstrate that extraction is proposed for the areas closely adjacent to and nearly surrounding the wetland.  Hence the Planning Board's finding that the proposed excavation will isolate the wetland and risk leaving it high and dry.  Contrary to MacQuinn's assertion that "the law" only prohibits excavation from within the wetland, the Planning Board's finding that closely proximal excavation will leave the wetland vulnerable, is sufficient to support its conclusion that the proposed excavation violates section J-1's command to maintain and preserve the isolated wetland to the maximum extent.

Since the Court has granted MacQuinn's Motion for Reconsideration to the extent that the Court has vacated its implicit findings relating to Cousins Hill, there is no need to address MacQuinn's arguments that Cousins Hill is not an environmentally sensitive area, that

---

[11] To the contrary, as discussed earlier, MacQuinn acknowledges: "It is obvious beyond the need for argument that development and operation of a gravel pit *necessarily* will include tree removals and soil 'disturbance.' It is not merely 'impracticable,' but in fact *impossible* to develop and operate a gravel pit without removing the trees and disturbing the soil." Rule 80B Brief of Party In Interest Harold MacQuinn, Inc., page 27 (emphasis in original).

section J.1 should be waived because it addresses aesthetic concerns analogous to section 7.D.4 of the Gravel Ordinance, or that the Court attributed to the Planning Board an unconstitutional interpretation of section J.1. All those arguments are tied to the implicit findings regarding Cousins Hill, which have now been vacated. To the extent MacQuinn presses any of those arguments to challenge the Planning Board's explicit findings regarding section J.1, which now constitute the basis for the Court's decision, MacQuinn's arguments are new, and thus waived since not presented previously.

CONCLUSION

For all the foregoing reasons, MacQuinn's Motion for Reconsideration or to Alter or Amend the Judgment is granted in part and denied in part. Although the Court revises its reasoning based on valid points raised in MacQuinn's Motion, the revised analysis does not change the result reached in the Court's prior Order. The Planning Board decision dated December 11, 2017 denying MacQuinn's SPRO application is affirmed. The Board of Appeals decision dated June 22, 2018 is reversed. The case is remanded to the Board of Appeals for the purpose of affirming the Planning Board's SPRO decision consistent with this Order, and denying MacQuinn's application for a permit under the SPRO.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.


Dated: June 17, 2019            _____/s_____
                                      Michael A. Duddy
                                      Judge, Business and Consumer Docket